Bruce MARTINDALE, Plaintiff-Appellant-Petitioner,

v.

Bruce A. RIPP, City of Beloit, Pekin Insurance Company, and Cities and Villages Mutual Insurance Company, Defendants-Respondents.

Supreme Court

*No. 99–0649. Oral argument November 1, 2000.—Decided July 12, 2001.*

## 2001 WI 113

(Also reported in 629 N.W.2d 698.)

73

For the plaintiff-appellant-petitioner there were briefs by *Edward E. Grutzner* and *Grutzner, Holland & Vollmer, S.C.*, Beloit, and oral argument by *Edward E. Grutzner*.

For the defendants-respondents there was a brief by *Ted Waskowski, Laura Skilton Verhoff* and *Stafford Rosenbaum, LLP,* Madison, and oral argument by *Ted Waskowski*.

¶ 1. DAVID T. PROSSER, J. Bruce Martindale seeks review of an unpublished decision of the court of appeals that affirmed certain rulings to exclude evidence by the Circuit Court for Rock County, Edwin C. Dahlberg, Judge.[1] These evidentiary rulings are the focus of this appeal.

¶ 2. In this personal injury case, the first issue presented is whether an oral surgeon who has testified that, in his opinion, an injury to plaintiff's temporomandibular joints (TMJs) was caused by the whiplash motion of the plaintiff's head and neck after plaintiff's car was struck from behind by a garbage truck, may be prohibited from explaining and describing to the jury the manner in which he thought the whiplash caused injury to the TMJs. The surgeon's excluded testimony was intended as part of the plaintiff's evidence establishing a causal link between the accident-related whiplash and the TMJ condition. The jury ultimately decided that the accident did not cause the TMJ condition.

¶ 3. The second issue presented is whether certain testimony about the plaintiff's fears about the possible complications of possible future surgery on his TMJs should have been excluded. This evidence was intended to support the plaintiff's claim for past, present, and future damages for mental distress.

¶ 4. After examining the record, we conclude that the circuit court erroneously exercised its discretion in excluding the testimony explaining the probable manner in which the plaintiff was injured. After conducting a harmless error analysis of this erroneous exercise of discretion, we conclude that the substantial rights of the plaintiff have been affected. Accordingly, we

---

[1] *Martindale v. Ripp*, No. 99–0649, unpublished slip op. (Wis. Ct. App. Oct. 28, 1999).

reverse and remand the case to the circuit court for a new trial.

I

¶ 5. The facts surrounding the automobile accident in this case are not in dispute. On the morning of September 14, 1993, Martindale was driving his 1992 Pontiac Bonneville in the City of Janesville. Martindale was in his early 50s. He stood six feet seven inches tall. He was such a tall man that the headrest in his vehicle "[sat] too low in any position."

¶ 6. Martindale was driving in the left lane on Highway 51. He came to a complete stop at an intersection just north of the Rock River, behind a car that was waiting to turn left. He later testified that he stopped his car approximately 20 to 25 feet behind the car ahead of him. As he waited for the car to turn, Martindale looked into his rear view mirror and saw a garbage truck "bearing down on [him]." He said he knew the truck was going to hit him. Hoping to avoid the collision, he pulled forward slightly from his dead stop and tried to go around the right side of the car in front of him, but his maneuver was blocked by the traffic in the right lane.

¶ 7. Martindale testified that the fully loaded garbage truck, which was owned by the City of Beloit (the City) and driven by Bruce Ripp, was traveling at an estimated speed of 20 to 25 miles per hour before it slammed into his car. Martindale estimated the speed from the observation he made in his rear view mirror and the impact of the collision. The force of the garbage truck drove Martindale's car into the vehicle ahead of him. His Bonneville finally stopped between 100 and 150 feet from its original position. The car suffered more than $9000 in damages.

¶ 8. Martindale testified that his head "whipped" backwards when the garbage truck collided with his car. His teeth "clashed" together when his head came forward. He chipped at least one tooth.

¶ 9. Martindale testified he initially had numbness from the accident, but after he "shook" the numbness he had "immediate pain" in his jaw and neck. He also had pain in his teeth. After talking with police, Martindale went to the emergency room of a local hospital for pain. He testified that he had a severe headache, a very sore neck, and pain in his teeth.

¶ 10. At trial, Martindale described the movement of his head and neck at the time of the collision. He said he thought his height and the type of headrest in the car contributed to his injuries. The "headrest was down" at the time of the crash, he said, facilitating the snapping back of his head as well as the clashing and chipping of his teeth. He claimed the whiplash movement of his head and jaw caused permanent injury to his TMJs—the joints connecting both sides of his jaw to his skull.

¶ 11. In the years after the accident, Martindale allegedly experienced a variety of health problems, primarily related to pain and discomfort in his TMJs. He sought treatment for his injuries from a number of doctors, but his primary caregivers were Dr. Harry Clark, his general dentist, and Dr. Doran E. Ryan, an oral and maxillofacial surgeon and professor at the Medical College of Wisconsin, to whom Martindale was referred by Dr. Clark.

¶ 12. The City admitted that Ripp was negligent in operating the garbage truck and that Ripp was acting on behalf of the City at the time of the accident. The City was at fault. However, the City disputed Martindale's claim that the accident had caused his alleged

TMJ problem, and it challenged the extent of his injury claims.

## II

¶ 13. Martindale filed suit against the City on April 30, 1996. His alleged damages included "severe personal injuries consisting primarily of permanent injury to his teeth," past and future hospital and medical expenses, loss of earnings and future earning capacity, and $9000 in damage to his car. By the time of trial, Martindale's claims for damages centered on the alleged injuries he suffered to his TMJs as a result of the accident. In addition, Martindale sought to recover for the alleged mental distress he had over potential future surgery on his jaw and the complications that might arise from the surgery. Martindale claimed all these damages resulted from the negligence of Ripp in causing the accident.

¶ 14. The gist of Martindale's case was that his TMJ injuries occurred as a result of (1) his head snapping back over his car's headrest in whiplash fashion when the garbage truck struck his car from behind, and (2) his head moving rapidly forward after his car struck the car in front of him.

¶ 15. The circuit court set a trial date for the spring of 1998, but the jury trial was not actually held until the fall. In May, the City filed a motion in limine to exclude certain testimony from Dr. Ryan's deposition. The circuit court entertained the motion at a hearing in June and ruled in large part in the City's favor. Later, Martindale moved the circuit court to reconsider its rulings. In September, the circuit court affirmed its earlier determinations.

¶ 16. Counsel for Martindale planned to present videotaped deposition testimony of the two doctors at

trial. This videotaped testimony was reduced to a written transcript, and the parties debated the admissibility of the testimony, in some instances on a line-by-line basis. The parties planned to edit the videotape after the circuit court's rulings to eliminate any inadmissible testimony for trial.

¶ 17. The City argued that Dr. Ryan should not be able to testify about the "mechanism" by which Martindale sustained injuries. Although the City conceded that Dr. Ryan was qualified to treat and assess Martindale's jaw injuries, it claimed he was not qualified to give an opinion about how the garbage truck hitting Martindale's car specifically caused Martindale's head and jaw to react. At the September hearing, the City characterized Martindale's efforts with Dr. Ryan's testimony as an inappropriate attempt to use Dr. Ryan as an "auto reconstruction accident expert."

¶ 18. The circuit court agreed with the City that certain portions of Dr. Ryan's deposition should not be admitted. The court excluded statements of Dr. Ryan's opinion concerning the "mechanism" that caused Martindale's TMJ injuries and his opinion regarding possible complications from possible future TMJ surgery. In addition, the court ruled Martindale could not present three exhibits to the jury, all of which related to the excluded testimony.

¶ 19. The circuit court excluded several pages of testimony by Dr. Ryan relating to the "mechanism" by which Martindale was injured. Initially, the circuit court did not provide reasoning for its decision that approximately four pages of deposition testimony would be excluded. Later in the hearing, when the City sought to clarify which exhibits had been excluded, counsel for Martindale, Edward Grutzner, expressed surprise that the court had ruled earlier in the hearing

to exclude the testimony concerning the "mechanism" or manner of injury. When the circuit court stated it had excluded that testimony, counsel said to the circuit court: "I didn't understand you to do so." The following exchange then occurred:

> The Court: [T]here is no foundation for the doctor's expertise in this particular thing, and he is not giving his opinion in this testimony to a reasonable standard of reasonable probability. What they are trying to do is to tie the issue in with some type of whiplash injury. I have thrown that out, and having thrown that out, [the diagram exhibit related to this testimony] is not admissible. We have resolved that.

> Mr. Grutzner: You say he doesn't have sufficient expertise in this area? Is that — because I filed his curriculum vitae, which is 20 pages long.

> The Court: I sustained. . .the objection to the testimony on that. . .there is a lack of foundation on the witness's qualifications that his opinions are not being given to a standard of a reasonable probability, and that there is — what it is is an attempt to try to tie the problem the defendant has with some whiplash mechanism. And I don't think this witness is competent to do it, and you have exception to the Court's ruling. That takes care of that one.

> Mr. Grutzner: So your reasoning is the competency of the witness to testify as to the manner in which the —

> The Court: The qualifications that he is not qualified to give an opinion in this field to a reasonable degree of professional probability. And that's my ruling. You are stuck with it, Counsel. Even an angel could give you no more. We have got that all covered then, now, as I understand it, gentlemen.

¶ 20. In September, when the court affirmed its ruling on Martindale's motion to reconsider, it said:

> There is no foundation on the witness's qualifications to give his expert opinion as to how the accident occurred and the testimony that's in the deposition. The witness is not giving his opinion to a standard of reasonable probability — what you are trying to do is tie the defendant's injury to some whiplash problem, but — and it may well be that a whiplash-type of thing caused it — but the testimony, in the judgment of the Court, doesn't meet the standard necessary in order to allow it. So I will reaffirm my prior ruling, and you again have exception. I can give you no more, Counsel.

¶ 21. The City did not object to some testimony by Dr. Ryan concerning the cause of the injury to Martindale. In the videotaped deposition, Dr. Ryan testified briefly about the cause of Martindale's injury when he verbally reviewed the medical and dental records he had examined and then stated that his "impression would be that the accident is what caused the displacement of the discs in his [temporomandibular] joint." This testimony was not excluded.

¶ 22. On the other issue, the circuit court excluded most of the contested testimony relating to fear of future surgery. Over objection from the City, however, the circuit court permitted Dr. Ryan to testify about the likelihood of success of TMJ surgery for Martindale. In doing so, the circuit court told Martindale's counsel: "You can get in the possibility of success, but not impossible complications if surgery is had." Thus, Dr. Ryan could not testify about complications that might result if Martindale had surgery. The circuit court also excluded two exhibits about the potential complications of TMJ surgery.

¶ 23. A two-day jury trial in the case began September 16, 1998, about five years after the accident. Martindale and his wife, Sandra Lee Martindale, testified on Martindale's behalf. Martindale also presented the videotaped deposition testimony of the two doctors. The City did not present any witnesses but it read into evidence a portion of Dr. Ryan's deposition.

¶ 24. The trial did not concentrate on the underlying auto accident because the City had admitted its negligence. Instead, the trial testimony centered on Martindale's alleged symptoms and injuries from the accident, as well as Martindale's subsequent interaction with Drs. Ryan and Clark. Martindale testified about visiting numerous other doctors but they were identified only by surname.

¶ 25. The City's defense was that Martindale had not suffered serious injury from the accident, and to the extent he had dental or skeletal injuries, the injuries were caused in part by a pre-existing bruxism condition.[2]

¶ 26. On a special verdict form the jury answered "no" to the question of whether Ripp's negligence caused Martindale's alleged injuries. The jury did find, however, that $6100 would compensate Martindale for his past and future pain, suffering, and disability. Nevertheless, the circuit court granted the City's motion for judgment on the verdict and dismissed Martindale's case.

¶ 27. To sum up, as a result of evidentiary rulings before trial, the circuit court excluded portions of

---

[2] Bruxism is "a clenching of the teeth, associated with forceful lateral or protrusive jaw movements, resulting in rubbing, gritting, or grinding together of the teeth, usually during sleep; sometimes a pathologic condition." *Stedman's Medical Dictionary* 216 (25th ed. 1990).

the videotaped deposition testimony by Dr. Ryan regarding the "mechanism" or manner of Martindale's injury and possible complications from possible future surgery. Then, during trial, the circuit court excluded testimony by Martindale about his fear of possible complications from possible future TMJ surgery. After trial, Martindale appealed all these exclusions of evidence.

## III

### A. Standard of Review of Evidentiary Decisions

¶ 28. We review a circuit court's decision to admit or exclude evidence under an erroneous exercise of discretion standard. *Morden v. Continental AG*, 2000 WI 51, ¶ 81, 235 Wis. 2d 325, 611 N.W.2d 659; *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983). In making evidentiary rulings, the circuit court has broad discretion. *State v. Oberlander*, 149 Wis. 2d 132, 140, 438 N.W.2d 580 (1989). This discretion includes whether a witness is qualified as an expert to offer opinion testimony pursuant to Wis. Stat. § 907.02 (1997–98).[3] *State v. Watson*, 227 Wis. 2d 167, 186, 595 N.W.2d 403 (1999); *Farrell v. John Deere Co.*, 151 Wis. 2d 45, 70, 443 N.W.2d 50 (Ct. App. 1989), *cited in* 7 Daniel D. Blinka, *Wisconsin Practice: Evidence* § 702.4, at 487 (2001). As with other discretionary determinations, this court will uphold a decision to admit or exclude evidence if the circuit court examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable

_____

[3] All subsequent statutory references are to the 1997–98 volumes unless noted otherwise.

conclusion. *Glassey v. Cont'l Ins. Co.*, 176 Wis. 2d 587, 608, 500 N.W.2d 295 (1993); *Loy v. Bunderson*, 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982).

¶ 29. Our inquiry into whether a circuit court properly exercised its discretion in making an evidentiary ruling is highly deferential:

> The question on appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record. *McCleary v. State*, 49 Wis. 2d 263, 182 N.W.2d 512 (1971). The test is not whether this court agrees with the ruling of the trial court, but whether appropriate discretion was in fact exercised.

*State v. Wollman*, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979), *quoted with approval in Pharr*, 115 Wis. 2d at 342; *see also Morden*, 235 Wis. 2d 325, ¶ 81. We will not find an erroneous exercise of discretion if there is a rational basis for a circuit court's decision. *State v. Hammer*, 2000 WI 92, ¶ 43, 236 Wis. 2d 686, 613 N.W.2d 629 (citing *Boodry v. Byrne*, 22 Wis. 2d 585, 589, 126 N.W.2d 503 (1964)). For a discretionary decision of this nature to be upheld, however, the basis for the court's decision should be set forth. *Pharr*, 115 Wis. 2d at 342. If the circuit court fails to provide reasoning for its evidentiary decision, this court independently reviews the record to determine whether the circuit court properly exercised its discretion. *Id.* at 343.

## B. Harmless Error Analysis of Evidentiary Decisions

██

¶ 30. An erroneous exercise of discretion in admitting or excluding evidence does not necessarily lead to a new trial. The appellate court must conduct a harmless error analysis to determine whether the error "affected the substantial rights of the party." If the error did not affect the substantial rights of the party, the error is considered harmless.

██

¶ 31. Two statutes govern this situation, Wis. Stat. § 901.03 (Rulings on evidence) and Wis. Stat. § 805.18(2) (Mistakes and Omissions; Harmless Error). Section 901.03 provides that error may not be predicated on a ruling that admits or excludes evidence "unless a substantial right of the party is affected." This statute must be read together with § 805.18(2), which provides that a new trial shall not be granted for an error unless the error has affected the substantial rights of the party. This latter provision, which dates back to the early years of Wisconsin statehood,[4] applies to both civil and criminal cases.[5] Martindale contends he deserves a new trial pursuant to this rule.

---

[4] The prohibition against reversal for procedural error that does not affect "substantial rights" has existed since § 84, ch. 120, Laws of 1856, and is embodied in Wis. Stat. § 805.18(2). *City of La Crosse v. Jiracek Cos., Inc.*, 108 Wis. 2d 684, 690, 329 N.W.2d 441 (Ct. App. 1982).

[5] *State v. Armstrong*, 223 Wis. 2d 331, 368 n.36, 588 N.W.2d 606 (1999), *mot. for recons. denied, State v. Armstrong*, 225 Wis. 2d 121, 591 N.W.2d 604 (1999) (clarifying harmless error analysis).

¶ 32. For an error "to affect the substantial rights" of a party, there must be a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue. *State v. Dyess*, 124 Wis. 2d 525, 543, 547, 370 N.W.2d 222 (1985); *see also Town of Geneva v. Tills*, 129 Wis. 2d 167, 184–85, 384 N.W.2d 701 (1986) (noting that the standard set forth in *Dyess* applies in civil cases as well as criminal cases). A reasonable possibility of a different outcome is a possibility sufficient to "undermine confidence in the outcome." *Dyess*, 124 Wis. 2d at 544–45 (quotation omitted). Where the erroneously admitted or excluded evidence affects constitutional rights or where the outcome of the action or proceeding is weakly supported by the record, a reviewing court's confidence in the outcome may be more easily undermined than where the erroneously admitted or excluded evidence was peripheral or the outcome was strongly supported by evidence untainted by error. *Id.* at 545.

IV

¶ 33. In a negligence case, the plaintiff must prove four elements: "(1) [a] duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." *Rockweit v. Senecal*, 197 Wis. 2d 409, 418, 541 N.W.2d 742 (1995).

¶ 34. The pivotal issue in this case relates to causation. In the pretrial motion hearing, Martindale's attorney told the court that Martindale had suffered a "rather unusual injury. I never have seen one before,

and I have not heard of a temporomandibular joint injury arising out of a whiplash occurrence."

¶ 35. The jury decided the case on causation. At the conclusion of the trial, the jury was asked: "Was the negligence of Bruce E. Ripp on September 14, 1993, a cause of injury to Bruce Martindale?" Its answer was "No." Thus, Martindale's suit was dismissed and Martindale recovered nothing for his alleged personal injuries.

¶ 36. This is the context in which Martindale contends that the circuit court erred in excluding certain expert opinion testimony and an exhibit explaining the mechanism of whiplash-related TMJ injury.

¶ 37. The expert witness was Dr. Ryan, an associate professor of oral and maxillofacial surgery and past chairman of the Department of Oral and Maxillofacial Surgery at the Medical College of Wisconsin. Dr. Ryan had served at the Medical College since 1981. He was board certified by the American Board of Oral and Maxillofacial Surgery in 1976 and had received advanced surgical training. He testified that at least half of his 34 publications dealt with TMJs. Dr. Ryan had an active practice in this specialized field. He examined Martindale twice (March 1997 and November 1997); he corresponded with Martindale's personal dentist, Dr. Clark; and he studied Martindale's medical and dental records,[6] including the records of Dr. Clark made shortly after Martindale's accident. Dr. Ryan diagnosed Martindale's TMJ condition and discussed

---

[6] Dr. Ryan testified in cross-examination that he had to see Martindale's medical records before he testified. Dr. Ryan said that Martindale had asked him whether he thought the accident caused the TMJ injury and Dr. Ryan said: "I can't tell without knowing whether he had a problem before."

the possibility of performing surgery. He observed a worsening of Martindale's condition between the two examinations.

¶ 38. During their first meeting, Dr. Ryan took Martindale's medical history and discussed the accident. He was told that Martindale had been driving a Pontiac Bonneville, that he had been hit by a fully loaded garbage truck from behind, that he was six foot seven inches tall, and that the headrest in his car was not high enough to brace the back of Martindale's head. He was told by Martindale that Martindale experienced whiplash in the accident and that the clicking in his jaw and the pain in his teeth and neck resulted from the accident.

¶ 39. In the deposition, Martindale's attorney asked:

> Mr. Grutzner: Did you form an — do you have an opinion to a reasonable degree of probability in the field of oral and maxillofacial surgery as to the cause of this condition of his temporomandibular joint?
>
> Dr. Ryan: In this particular case, going by the history that I had from Mr. Martindale, he had been involved in a automobile accident in which he was hit from behind by, I think, a garbage truck and at that point he had a whiplash injury and not long after that he noted — noticed a clicking in his jaw. And I've reviewed some of the records or at least the ones that were sent to me from his dentist, who has been his dentist for a long time, and he said he didn't have that problem before. And I've looked at some of the medical records and there doesn't seem to be any indication that he had problems with his temporomandibular joint discs before the accident. So for that reason, I would — my — my impression

would be that the accident is what caused the displacement of the discs in his joint.

¶ 40. This answer from Dr. Ryan was admitted into evidence and is part of the record.[7] Dr. Ryan also testified that from what he understood, Martindale had never complained of pain in the temporomandibular joint, or had his teeth hurt when eating, or had any difficulty moving his jaw during the many years he was a patient of Dr. Clark—until immediately after the accident.

¶ 41. This was the background leading up to the excluded testimony. In the middle of Dr. Ryan's deposition, Martindale's attorney produced a large diagram of a head in three different positions, purporting to depict the movement of the head and jaw during a whiplash injury. The following exchange and the exhibit were excluded by the court:

> Mr. Grutzner: Doctor [Ryan], I'm showing you what's been marked as Exhibit Number 11 and ask you if you have reviewed a — this drawing before it was made so big?
>
> Dr. Ryan: Yes, I have.
>
> Mr. Grutzner: And did you review it to — for accuracy to see whether or not it accurately reflected the mechanism of whiplash-related internal disc injury regarding Bruce Martindale?
>
> Dr. Ryan: Yes.
>
> Mr. Grutzner: And my first question is, in your opinion, is this an accurate representation of the mechanism of whiplash-related internal disc injury?

---

[7] The court of appeals was mistaken when it wrote that this testimony was excluded.

Dr. Ryan: Yes, it is.

Mr. Waskowski: I object to the extent that the witness is talking about this particular case. I don't think there's any foundation that the witness has any idea how this [accident] occurred.

Mr. Grutzner: Well, you've already testified, have you not, Doctor, that you understood that Mr. Martindale was in his automobile when he was struck behind by a garbage truck owned by the City of Beloit?

Dr. Ryan: Yes.

Mr. Grutzner: And that he sustained a whiplash injury as a result of that collision?

Dr. Ryan: Yes.

Mr. Grutzner: And that he's a man of about six feet seven inches tall, is that correct?

Mr. Waskowski: I — I'm going to object to leading the witness and telling the witness what perhaps he should know, but he — he — this — we — we both realize that this witness knows nothing about the vehicle that Mr. Martindale was driving and on that basis alone there is no possibility that this witness or any other similarly situated witness could possibly testify that the chart that you are showing him is an accurate representation of what occurred in this accident.

Mr. Grutzner: You may answer, Doctor.

Dr. Ryan: Well, I do know which kind of automobile he was in. He was in a Bonneville. And I also know that he testified that his — his headrest was too low for his head and that this would depict what could happen in a whiplash injury and I have no other reason to believe that he had an injury to his jaw other than the whiplash injury in this accident.

93

And since I've already testified that I think the accident caused this problem, this is the mechanism of — I believe — causes internal joint derangement.

Mr. Grutzner: All right.

Mr. Waskowski: Excuse me. I object based on the witness' answer and move to strike.

Mr. Grutzner: Doctor, the middle picture shows what's depicted there as normal. And what does that show, Doctor?

Dr. Ryan: That shows the disc — the disc sitting in between the jaw bones like it's supposed to be.

Mr. Grutzner: All right. And —

Dr. Ryan: With it — and at that point the patient's teeth are together.

Mr. Grutzner: The — on the right it says hyperextension, what does that mean?

Dr. Ryan: That means the jaw is — is swung forward and it moves out of where it normally is and it's slung forward and it's done very rapidly so that you get a separation of the disc from the lower jaw bone.

Mr. Grutzner: First — and do — do you have an opinion as to whether or not that is what occurred in the injury that Bruce Martindale sustained?

Dr. Ryan: I think it did, yes.

. . . .

Mr. Grutzner: Over on the left side it says hyperflexion. What does that mean, Doctor?

Dr. Ryan: That means he's gone — his head has gone forward this way.

. . . .

94

Dr. Ryan: And what happens then, the — the lower jaw is thrown back at this point and it gets caught back in behind the disc. As we can see here, the disc is trapped in front. We now have stretching of this ligament or tearing of this ligament and that — that's the mechanism you end up with a disc being displaced.

Mr. Grutzner: And do you have an opinion as to whether or not that occurred to Bruce Martindale at the time of the — when the garbage truck struck him from the rear? ·

Dr. Ryan: I think it is, yes.

¶ 42. Martindale complains that the circuit court's exclusion of this evidence disrupted his ability to prove causation of injury—the one decisive issue in his suit. In particular, Martindale contends the circuit court "committed an error of law" when it excluded this testimony by Dr. Ryan after having earlier admitted testimony by the doctor regarding causation.

¶ 43. The circuit court agreed with the City that Dr. Ryan was not qualified as an expert to give an opinion about Martindale's head and jaw movement as a result of the garbage truck striking his car from behind. The court of appeals summarized the circuit court's position as "believing that there was no evidence that Ryan had any knowledge as to what happened to Martindale in the collision—no knowledge of the 'mechanics' of the accident or his actual injury, or that the impact in fact caused a 'whiplash.' " *Martindale v. Ripp*, No. 99–0649, unpublished slip op. at 5 (Wis. Ct. App. Oct. 28, 1999). The court of appeals noted that Dr. Ryan never inspected Martindale's car (or a similar model) "and knew nothing about Martindale's movements or what happened to him or the car at and after the moment of impact." *Id.*

¶ 44. Wisconsin Stat. § 907.02 authorizes experts to give opinion testimony. Section 907.02 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The general rule in Wisconsin is that expert testimony is properly admitted into evidence if, after the circuit court finds a witness is qualified to answer a particular question, the testimony might "assist the trier of fact." Wis. Stat. § 907.02; *see also* 7 Blinka, *supra*, §§ 702.1–702.202, at 472–78 (2001).

¶ 45. The qualification of an expert witness to testify on an issue is a preliminary question of fact for the circuit court to decide under Wis. Stat. § 901.04(1). 7 Blinka, *supra*, § 702.4, at 487. The determination of a witness's qualifications to offer an expert opinion is normally a decision left to the discretion of the circuit court. *Watson*, 227 Wis. 2d at 186; *Simpsen v. Madison Gen. Hosp. Ass'n*, 48 Wis. 2d 498, 509, 180 N.W.2d 586 (1970); *Farrell*, 151 Wis. 2d at 70, *cited in* 7 Blinka, *supra*, § 702.4, at 487. The circuit court's discretion in this determination is unquestionably entitled to substantial deference, and we will uphold a decision to admit or exclude evidence if the circuit court examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion. Nonetheless, our decisions speak of "sound discretion," *Simpsen*, 48 Wis. 2d at 509, "a reasonable conclusion," *Farrell*, 151 Wis. 2d at

70; and "the essential demands of fairness." *State v. Koch*, 144 Wis. 2d 838, 847, 426 N.W.2d 586 (1988), signifying that even evidentiary rulings may be held to account.

■■

¶ 46. Here the circuit court erred for several reasons. First, the circuit court excluded expert testimony that would have assisted the trier of fact in understanding the evidence and determining the issue of causation. After recognizing Dr. Ryan's credentials, permitting him to testify as an expert, and allowing him to give his opinion as to the cause of Martindale's medical condition, the court denied the expert the ability to explain the "mechanism" that prompted him to reach his conclusion. As a result, the trier of fact never received an explanation of how whiplash could lead to the stretching and tearing of ligament and the displacement of the discs that are part of the TMJs. In excluding this explanation, the circuit court deprived the jury of expert testimony that could have assisted it in sifting through the evidence and reaching its own conclusion. 7 Blinka, *supra*, § 702.2, at 473. It also seriously undermined the credibility of the expert's opinion.

¶ 47. Second, at least three times the court stated that Dr. Ryan was attempting to tie the TMJ problem in "with some kind of whiplash injury," but that "there is no foundation for the doctor's expertise in that particular thing." Dr. Ryan was not "competent" to describe "some whiplash mechanism" that would tie whiplash to "the problem the defendant has," the court declared.

¶ 48. Dr. Ryan was certainly an expert in matters concerning temporomandibular joints. Consequently, he should have been allowed to explain

how he thought Martindale's TMJ condition was created if he had a reasonable foundation for Martindale's whiplash.

¶ 49. Dr. Ryan's opinion was not the source of the fact that Martindale suffered whiplash. Martindale was the source of that fact. He told Dr. Ryan and others that he had experienced whiplash in the accident, and whiplash was also reflected in Martindale's medical records. Martindale said his whiplash occurred when his head "whipped" *backward*, over the lowered headrest, when his car was hit from behind; then his head snapped *forward* and his teeth clashed together, when his car was propelled into the vehicle in front of him. The City did not present any evidence that Martindale's whiplash was caused by anything other than a backward and forward movement. Dr. Ryan relied on this information in forming his opinion about the cause of the TMJ condition.

¶ 50. The facts upon which an expert bases an opinion or inference may be those perceived by or made known to the expert before the hearing. Wis. Stat. § 907.03. Both Dr. Ryan's admitted testimony and his excluded testimony were consistent with this rule. Because Dr. Ryan was basing his opinion on information he had received from Martindale, plus other information, he had a good foundation for offering the opinion, and the circuit court erred in denying it to the jury.

¶ 51. Third, the circuit court appears to have accepted the City's argument that Dr. Ryan was attempting to testify as an automobile accident reconstruction expert, giving opinions on matters beyond his competence. The court said bluntly: "There is no foun-

dation on the witness's qualifications to give his expert opinion as to how the accident occurred."
██

¶ 52. A witness must be qualified to answer the question put to him. As Professor Blinka explains it, "a witness eminently capable on one subject may not be sufficiently qualified to give helpful testimony on another, albeit related, issue in the case." 7 Blinka, *supra*, § 702.4, at 489 (citing *Lemberger v. Koehring Co.*, 63 Wis. 2d 210, 216 N.W.2d 542 (1974)). "No expert has *carte blanche*." *Id.* at 490.

¶ 53. The *Lemberger* case, 63 Wis. 2d 210, is instructive of the principle at issue. Lemberger was a construction worker who suffered a depressed skull fracture when a 16-pound block of wood, supposedly secured to a crane, fell 70 to 80 feet from the crane and hit him on the head. Lemberger was not wearing a "hard hat" when the injury occurred. Lemberger sued the manufacturer of the crane. At trial, the manufacturer was found 40 percent negligent and Lemberger was found 60 percent negligent. During the course of the trial, the manufacturer presented testimony from a neurologist, Dr. Millen, who gave his opinion that if Lemberger had been wearing a hard hat, serious injury would have been prevented. *Id.* at 218. Lemberger appealed the admission of this testimony.

¶ 54. This court ruled the neurologist's testimony exceeded his expertise:

> [W]e see no basis for the admission of Dr. Millen's deposed testimony. Dr. Millen is a neurologist, who specializes in psychology and the physical disorders of the nervous system. He may well be an expert on personal injuries, and it was agreed that he had some knowledge of the basic laws of physics involving the forces asserted by falling objects. He was

99

permitted, however, to express the opinion that, had Lemberger been wearing a hard hat, serious injury would have been prevented. That opinion was not within the field of Dr. Millen's expertise. The only knowledge he had in that field was the very meager information that he had gleaned from the fact that his father-in-law ran a construction company, that his son had worked for that construction company, and that hard hats were used in the work. He had no expertise or special knowledge on the capacity of a hard hat to withstand impact and to prevent a skull injury. To the extent that Dr. Millen was permitted to testify as an expert on the protective capacity of the hard hat, his opinion was beyond his qualifications and should have been excluded by the trial judge. He did not have " 'such skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.' "

*Id.* at 217–18 (citation omitted). Nevertheless, the court ruled such an admission of testimony did not, standing alone, require a reversal of the verdict for the defendant, based on the cumulative nature of the evidence.[8] *Id.* at 218.

¶ 55. The result in *Lemberger* is inapposite here because Dr. Ryan did not testify beyond his expertise. He did not present himself as an accident expert. The jury knew that he did not examine Martindale until more than three years after the accident, and he did not try to describe exactly what happened inside Martindale's car. Instead, he was given certain facts about the accident: a Pontiac Bonneville was hit from behind by a fully loaded garbage truck, forcing the vehicle into the

---

[8] This court did reverse and remand in *Lemberger v. Koehring Co.*, 63 Wis. 2d 210, 227, 216 N.W.2d 542 (1974), but did so on other grounds.

car ahead. The driver of the car was six feet seven inches tall. The headrest in his car was "too low for his head." The driver suffered a whiplash injury in the accident. Having and accepting this information, as well as the results of his own examinations, and having no plausible alternative for Martindale's TMJ condition, Dr. Ryan attempted to explain "what could happen in a whiplash injury." His testimony and the accompanying exhibit were intended to explain to the jury how Dr. Ryan believed Martindale's whiplash-related injuries occurred.

¶ 56. Dr. Ryan testified that the whiplash injury caused the TMJ problem, not that the accident had caused the whiplash injury. The fact that Martindale had suffered a whiplash injury was not contested. Thus, Dr. Ryan, unlike Dr. Millen, did not stray outside his field of expertise. If Dr. Ryan had tried to testify about the speed of the garbage truck, the distances required to brake a garbage truck at a particular speed, the physics of Martindale pulling his car forward when he noticed the garbage truck bearing down on him, the significance of the garbage truck being fully loaded, the importance of a particular angle of collision, or how fast Martindale's head snapped backward and then forward, the issue would be different.[9]

---

[9] The dissent's citation to *Simpsen v. Madison General Hospital*, 48 Wis. 2d 498, 510–11, 180 N.W.2d 586 (1970), is inapposite. Justice Wilcox's dissent at ¶ 111. *Simpsen* involved the question whether a podiatrist—as opposed to a surgeon who was involved in the case—was qualified to testify concerning the cause of post-operative complications. This court affirmed the circuit court's exclusion of the podiatrist's testimony. *Simpsen*, however, involved what *type* of medical witness was qualified to speak concerning causation, not *whether* a medical

¶ 57. In the past, courts have permitted medical experts to testify when the testimony helped the trier of fact to analyze the causal link between an injury and negligent conduct. For instance, in *Liles v. Employers Mutual Insurance of Wausau*, 126 Wis. 2d 492, 497–99, 377 N.W.2d 214 (Ct. App. 1985), a woman was injured in an automobile accident. Her orthopedic surgeon later discovered a degenerative disc disease that required surgical treatment. At trial, Dr. Hagens testified that the cause of the disc disease was the automobile accident. "Dr. Hagens testified. . .that there was a causal relationship between the accident and the dis[c] disease." *Id.* at 499. The court upheld this testimony.

¶ 58. *Pucci v. Rausch*, 51 Wis. 2d 513, 187 N.W.2d 138 (1971), was another automobile accident case. Dr. Peterson testified that "in his opinion Mrs. Pucci had a previously existing back condition which was aggravated by the automobile accident." *Id.* at 518. His testimony, which would have been sufficient to sustain causation, was stricken by the circuit court. We reversed, concluding that "the trial court acted hastily in striking the doctor's testimony and it was error to do so." *Id.* at 520.

¶ 59. The *Pucci* court made the important observation that medical testimony is not always based upon absolute certitude. It is sometimes based upon "empirical knowledge and experience in the area of cause and effect. The term 'medical probability' more accurately expresses the standard. The standard requires a conviction of the mind or that degree of positiveness that the doctor has in his opinion, which is based upon his

witness of some type could testify about a matter, as is the case here.

knowledge of medicine and the case facts." *Id.* at 518–19.

¶ 60. Dr. Ryan's testimony would have assisted the jury on the element of causation. In attempting to describe and explain the manner in which he thought the injuries probably occurred, Dr. Ryan did not go beyond his competence as an expert.

¶ 61. Fourth, in effect the circuit court ruled that Dr. Ryan's expertise in oral and maxillofacial surgery did not qualify him to give his opinion about what is known as the "occupant kinematics" of the accident.

¶ 62. Kinematics is "[t]he branch of mechanics that studies the motion of a body or a system of bodies without consideration given to its mass or the forces acting on it." *The American Heritage Dictionary of the English Language* 992 (3d ed. 1992).[10] In simpler terms, the term "occupant kinematics" relates to the movement of an occupant's body in a situation. In this case, the occupant kinematics of this accident concern Martindale's body movement—particularly his head, neck, and jaw motion—as a result of this accident.

¶ 63. The dilemma here—that is, the permissible extent of physician testimony about the physical effects of an automobile accident on the body—has arisen in cases elsewhere. *See Gorman v. Hunt*, 19 S.W.3d 662, 670 (Ky. 2000) (ruling that trial court properly exercised its discretion in admitting testimony by physician concerning physical position of pedestrian plaintiff

---

[10] This court has previously defined this term as " 'a branch of dynamics that deals with aspects of motion (as acceleration and velocity) apart from considerations of mass and force.' " *Sumnicht v. Toyota Motor Sales*, 121 Wis. 2d 338, 364, 360 N.W.2d 2 (1984) (quoting *Webster's Third New International Dictionary* 1243 (1967)).

struck by a vehicle); *see also Lind v. Slowinski*, 450 N.W.2d 353, 358–59 (Minn. Ct. App. 1990) (affirming decision by trial court to exclude testimony by physician regarding positioning of automobile occupant on another occupant's lap during a collision). Occupant kinematics is commonly a major issue in "second collision" or "crashworthiness" cases.[11] *Sumnicht v. Toyota Motor Sales*, 121 Wis. 2d 338, 364, 360 N.W.2d 2 (1984); William Petrus, *Injury Causation Experts Prevent Cases From Crashing*, Trial, Aug. 2000, at 54.

¶ 64. The court of appeals appeared to extend the circuit court's determination, implying that a plaintiff must employ an expert in occupant kinematics in what is arguably a simple accident case that has not given rise to a "crashworthiness" claim. We disagree.

¶ 65. An accident reconstruction expert or an expert in kinematics is not required for an elementary discussion of whiplash, which is the abrupt jerking motion of the head, either backward or forward. Expert testimony on kinematics is not necessary to confirm the potential for whiplash when a fully loaded garbage truck smashes into a barely moving or stopped automobile, pushing it into another vehicle, sending it 100 to 150 feet from the point of origin, and causing $9000 in damages to the vehicle. Requiring specialized expert testimony beyond a medical expert in relatively simple automobile accident situations would escalate the cost

[11] "The crashworthiness doctrine imposes liability upon a manufacturer in a vehicular collision case for design defects which do not cause the initial accident but which cause additional or more severe injuries when the driver or passenger subsequently impacts with the defective interior or exterior of the vehicle." *Sumnicht*, 121 Wis. 2d at 348–49. Most courts use the terms "crashworthy" and "second collision" interchangeably. *Id.* at 348 n.4.

of presenting personal injury cases without adequate justification. In short, it would present a serious issue in the administration of the legal system.

¶ 66. Testimony concerning the cause of an injury by a medical expert with experience in treating a particular injury can be vital for parties who suffer bodily injury. We recognize that certain accidents or certain causes of action, *e.g.*, crashworthiness claims, may present facts that require expert testimony by a witness such as an engineer or an accident reconstruction expert. However, this simple case is not one of those, based on our analysis of the proffered testimony.

¶ 67. Finally, the circuit court stated that Dr. Ryan was "not giving his opinion in this testimony to a reasonable standard of reasonable probability." Although neither party discussed this issue on appeal, we note that early in his testimony, Dr. Ryan was asked to give his opinion "to a reasonable degree of probability in the field of oral and maxillofacial surgery as to the cause of this condition of [Martindale's] temporomandibular joint." Much of the subsequent testimony excluded by the court was merely an explanation of the mechanism of whiplash and how Dr. Ryan thought that applied to Martindale. A fair reading of his testimony shows that Dr. Ryan was not giving his opinion on mere conjecture.

¶ 68. The standard in this state for the admission of expert testimony is not stringent. This court "has repeatedly emphasized that 'assistance,' 'aid,' and 'helpfulness' to the trier of facts are the touchstones of admissibility." 7 Blinka, *supra* § 702.202, at 478. In light of Dr. Ryan's extensive qualifications in treating TMJ injuries, we conclude that his testimony would

have assisted the jury in analyzing whether the whiplash from the collision caused the alleged injuries.

¶ 69. Notwithstanding our conclusion that the circuit court erroneously exercised its discretion, we will not disturb the judgment entered on the jury's verdict unless "substantial rights" of Martindale have been affected. Wis. Stat. § 805.18(2). We must therefore determine whether the error was harmless.

¶ 70. In a special verdict the jury found the impact from the City's garbage truck did not cause Martindale's injuries. The jury did find, however, that $6100 would compensate Martindale "for past and future pain, suffering, and disability sustained as a result of the accident." The circuit court entered judgment on the jury's verdict and Martindale did not recover any damages.

¶ 71. The standard for harmless error is whether there is a "reasonable possibility" that the error contributed to the outcome of the action or proceeding at issue. *Dyess*, 124 Wis. 2d at 543. A "reasonable possibility" of a different outcome is a possibility sufficient to undermine confidence in the outcome. *Dyess*, 124 Wis. 2d at 545.

¶ 72. We conclude that the erroneous exclusion of Dr. Ryan's testimony created a reasonable possibility that if the evidence had been admitted the verdict would have been different. Our decision is based upon several factors. In his cross-examination of Dr. Ryan, the City's attorney, Ted Waskowski, was very effective in suggesting an alternative cause for Martindale's TMJ condition, namely, that Martindale had been "a tooth grinder and a teeth clencher" before the accident. In short, there was evidence of bruxism that predated the accident. In his cross-examination, which was

played to the jury, Waskowski skillfully used Dr. Ryan to imply that Martindale had embellished his injury and misrepresented its source. The City built on this theory in closing argument:

> Let me just say a couple things more about whether this [the jaw injury] was caused by the accident. I really don't know. It seems to me that *if I had to guess, Mr. Martindale has a minor problem that probably has been nagging him a bit off and on for years.* And this accident really has nothing to do with it. But based on this evidence, I am guessing and we would all have to guess. The judge will instruct you if you have to guess what the answer will be, if you have to guess, then Mr. Martindale has not met his burden of proof. And under that circumstance he would be — you would find that he has no damages because he hasn't proved any if you have to guess (emphasis added).

■■

¶ 73. Then Waskowski delivered the coup de grace, by stressing the absence of causation evidence from Martindale's expert witnesses:

> *Was this caused by the accident? One very interesting thing to me is we have a highly qualified doctor and we have a good, honest dentist, Dr. Clark. And neither of them made any attempt at all to describe how it is that this jaw problem resulted from the accident.* How? I mean not, yes, he started complaining right after the accident and see it must be somehow but [nobody] tried to even explain to you how. *Nobody tried to prove that.* How? He had a slight chip on one tooth. But it's the bottom part of your jaw that moves. Not the top. The top is part of your head. *Nobody even bothered to explain here what happened. . . .*Here is what happened. What

happened? How did getting hit from behind cause this accident? We could get — we could say, well, maybe it was this, maybe it was that. But there is no evidence. You gotta guess. And I think since you have to guess, the answer to the first question that's gonna be put to you is. . .what injury was caused by Mr. Ripp to Mr. Martindale. The answer is, you don't know. And if you don't know, if you have to guess, the answer is no. And I think truthfully, if you truthfully consider the evidence, that is the answer that you would have to give (emphasis added).

This argument coupled with the prior exclusion of Dr. Ryan's deposition testimony explaining causation, has undermined our confidence in the outcome of the trial. The testimony by Dr. Ryan, as well as the accompanying exhibit, would have assisted the trier of fact to such a degree in understanding the cause of Martindale's alleged injuries—*the* issue in the trial—that we conclude the error clouds the validity of the jury's verdict sufficiently to meet the "reasonable possibility" standard described above. Accordingly, we reverse the judgment and remand for a new trial.

## V

¶ 74. We turn now to Martindale's other claim, that the circuit court erroneously exercised its discretion in excluding testimony relating to Martindale's fear of possible future surgery. The circuit court excluded testimony by Martindale and Dr. Ryan regarding the specific possible complications that may arise from TMJ surgery. The circuit court did allow some testimony by Martindale expressing fear of surgery and testimony by Dr. Ryan rating the chances of surgical success on Martindale's jaw.

## A. Dr. Ryan's Testimony

¶ 75. Mental distress damages caused by an accident in which the plaintiff suffers physical injury are compensable. *Rennick v. Fruehauf Corp.*, 82 Wis. 2d 793, 804–05, 264 N.W.2d 264 (1978). Damages for a specific species of mental distress, fear of possible future surgery, are compensable. *Brantner v. Jenson*, 121 Wis. 2d 658, 360 N.W.2d 529 (1985). *Brantner* is the leading case on this subject. In *Brantner*, the defendant contended that the circuit court should not have allowed the plaintiff and his surgeon to testify regarding possible future back surgery because the plaintiff did not prove to a reasonable degree of medical probability that his injury would require surgery. *Id.* at 665.

¶ 76. In *Brantner*, the plaintiff suffered a back injury as a result of an automobile accident. *Id.* at 661. The plaintiff's physician prescribed back exercises and a back brace to minimize pain. *Id.* The physician also advised the plaintiff his injury might require surgery if these techniques did not relieve the pain and keep him working. *Id.* at 661–62. At subsequent visits with the physician the plaintiff continued to report pain; the physician advised the plaintiff that if pain continued and interrupted his ability to work or live comfortably, surgery might be required. *Id.* at 662.

¶ 77. At trial, the jury awarded the plaintiff damages for past, present, and future mental distress relating to possible future back surgery. *Id.* at 660. The plaintiff's surgeon testified he had discussed "the operation, recovery time, risks, chances of success and possible subsequent disability" with the plaintiff on numerous occasions. *Id.* at 662. The plaintiff testified

as to these conversations, as well as a conversation he had with his father concerning back surgery. *Id.* at 660. The defendant argued, however, that neither the physician nor the plaintiff properly testified because the plaintiff did not "prove to a reasonable degree of medical probability that he will require the back surgery in the future." *Id.* at 665.

¶ 78. This court affirmed the decision of the court of appeals favoring the plaintiff, Brantner. The court stated:

> We conclude that fear of surgery may be reasonably certain, even though there is no certainty that surgery will occur and even though the physician cannot testify to a reasonable degree of medical probability that the consequence feared will occur. . . .A doctor's realistic prediction as to the possibility of future surgery, illness or disability may give rise to reasonable fear and anxiety in the victim concerning his or her future health and well-being.
>
> . . . .
>
> . . .Although the surgeon was not able to testify that back surgery was reasonably probable in the future, the disclosure of the realistic possibility of back surgery as a natural consequence of the injuries under the facts of this case is sufficient to enable a jury to find to a reasonable certainty that the plaintiff has sustained, and will sustain, mental distress as a result of the defendant's negligent conduct.

*Id.* at 666–67 (footnote omitted). The *Brantner* court discussed a two-part test employed by the court of appeals in that litigation, but it did not explicitly adopt the test. *Id.* at 668–69 (analyzing *Brantner v. Jenson*, 120 Wis. 2d 63, 66–67, 352 N.W.2d 671 (Ct. App. 1984)).

¶ 79. The *Brantner* court qualified its recognition of the relevance of a plaintiff's evidence regarding possible future consequences, however. That is,

> fear of future surgery is not reasonably certain and a defendant would not be liable for damages for mental distress when a medical witness describes to the victim or to the jury remotely conceivable complications which may develop from the physical injury caused by the defendant's negligence. Anxiety about a fictitious or imagined or highly unlikely consequence is not a recoverable element. *Howard v. Mt. Sinai Hospital, Inc.*, 63 Wis. 2d 515, 217 N.W.2d 383 (1974). Liability ceases at a point dictated by public policy and common sense. *Wilson v. Continental Ins. Co.*, 87 Wis. 2d 310, 325, 274 N.W.2d 679 (1979) (quoting Justice Hansen's concurrence in *Howard v. Mt. Sinai Hospital, Inc.*).

*Id.* at 666–67. Applying the *Brantner* test here, if the evidence proffered by Martindale describes "remotely conceivable complications" from the possible surgery that he faced, he cannot recover for fear of those complications.

¶ 80. The circuit court allowed testimony by Dr. Ryan about the option of TMJ surgery on Martindale. Dr. Ryan first rated the chances of success at 85% for repair to the discs in his TMJ's and 75% for disc removal. In addition, moments after this assessment, Dr. Ryan rated the chances of success at 85% for Martindale's right side and 75% for his left side, although he did not indicate the procedure about which he was talking. The circuit court permitted this evidence over objections from the City based on *Brantner*.

¶ 81. Martindale, however, complains of the exclusion of testimony and exhibits relating to his alleged fear of possible future surgery that the circuit

court did exclude. The exclusions by the circuit court included testimony by Dr. Ryan that he "probably" discussed all the potential complications of TMJ surgery with Martindale. The circuit court also excluded two exhibits that Dr. Ryan discussed during his deposition testimony. The first exhibit was entitled "Post-Operative Complications." The second exhibit also related to post-operative complications.

¶ 82. At trial, the circuit court also ruled that Martindale himself could not testify regarding the possible complications of TMJ surgery. Martindale's counsel sought to elicit testimony from Martindale about the risks of surgery that he heard from Dr. Ryan and the risks of complications that he learned from the internet.

¶ 83. In *Brantner*, this court considered whether a plaintiff has to prove to a reasonable certainty that his or her injury would require surgery in the future. This court answered that inquiry negatively, indicating that a plaintiff must prove to a reasonable certainty that he or she *has a fear of surgery*; a plaintiff need not prove to a reasonable certainty that he or she will need surgery. The plaintiff must do two things, however, in order to advance a claim for fear of future surgery: (1) The plaintiff must establish a reasonable fear of the possibility of future surgery, which according to *Brantner* may be accomplished with a doctor's realistic prediction as to the possibility of future surgery; and (2) the plaintiff may not present evidence of fear of future surgery if the evidence relates to "remotely conceivable complications" or "a fictitious or imagined or highly unlikely consequence." *Brantner*, 121 Wis. 2d at 666–67.

¶ 84. This case requires an additional analytical step. The dispute here requires us to decide if, after a circuit court decides that a plaintiff may testify concerning his or her fear of surgery, the court may thereafter exclude testimony by the plaintiff and a medical witness about the specific possible complications of surgery.

¶ 85. Despite this extra analytical step, *Brantner* provides all the guidance this court needs in analyzing whether the circuit court made a sustainable use of discretion. *Brantner* said that a plaintiff cannot recover for "damages for mental distress when a medical witness describes to the victim or to the jury *remotely conceivable complications* which may develop from the physical injury caused by the defendant's negligence." *Brantner*, 121 Wis. 2d at 666–67 (emphasis added).

¶ 86. We must be mindful that our inquiry does not rest on what we would have done in the circuit court's position, but instead on whether a reasonable judge could make the same decision. *Wollman*, 86 Wis. 2d at 464. When the circuit court ruled that Dr. Ryan could not testify regarding potential complications, it stated that Martindale could "get in the possibility of success [of surgery], but not impossible complications if surgery is had." We read this statement by the circuit court to mean the plaintiff had not offered sufficient evidence to show such complications were more than remotely conceivable, if conceivable at all. This reading of the record is supported by the numerous references the circuit court made to the possibility of complications from the surgery.

¶ 87. Martindale, however, takes issue with the circuit court's seemingly interchangeable use of words to describe the standard required of Dr. Ryan's testi-

113

mony about the complications of surgery. The circuit court used the words "reasonable probability," "reasonable possibility," "what complications might occur," "complications that might result," and "impossible complications," when it ruled that Dr. Ryan could not testify about the complications of potential future surgery.

¶ 88. Notwithstanding the inconsistent terminology used by the circuit court, it is apparent based on our reading of the record that the circuit court determined Martindale had not shown that the potential complications were anything more than remotely conceivable. We conclude the circuit court had a reasonable basis to make this decision because the record is devoid of any evidence from any qualified witness about the likelihood of any complications if surgery did occur. Dr. Ryan's statement in which he rated the chances of success of surgery is insufficient by itself to show that complications were not just remotely conceivable. Certainly, the surgery could be deemed a success, but also entail complications.

¶ 89. Had Martindale presented Dr. Ryan's "realistic prediction as to the possibility of future surgery," and evidence that complications were more than remotely conceivable, we would be compelled to find the circuit court erroneously exercised its discretion. *Brantner*, 121 Wis. 2d at 666. This simply did not occur.

¶ 90. The circuit court properly exercised its discretion in excluding the testimony of the doctor on potential complications on the basis that remotely conceivable complications do not give rise to damages for fear of possible future surgery. Accordingly, we also conclude the circuit court properly exercised its discre-

tion in excluding the exhibits relating to post-operative complications and this excluded testimony.

## B. Martindale's Testimony

¶ 91. We also find the circuit court properly exercised its discretion in excluding testimony by Martindale that revealed he had learned additional information on the possible complications of TMJ surgery from internet sources. The circuit court initially overruled objection by the City during the direct examination of Martindale concerning what he had learned from the internet. Based on our reading of the record, the circuit court anticipated the plaintiff might testify as to accounts or stories of persons who suffered complications from TMJ surgery. Apparently, the circuit court would have allowed such testimony. The City asked for argument outside the presence of the jury. When the plaintiff began testifying during an offer of proof about the very specific medical effects of TMJ surgery, however, the circuit court sustained further objection by the City.

¶ 92. During the offer of proof, Martindale stated:

> [I] have learned that there are a lot of risks. That I can end up with some severe problems if the surgery does not go as planned. I could become — I could have problems with degeneration of the bones, the jaw bones, and have to face the possibility of reconstructive surgery, and loss of motion — those kinds of things.
>
> [W]hat I have really learned is that everything that I have, basically, that Dr. Ryan — it's all been confirmed. That reading documentaries, case histories, studies, they are all medical records, medical

papers, and basically, they are confirming everything that I have already heard.

Basically, what has been confirmed by these papers that I have read is that I have a high risk of — or a risk of degenerated bone disease, arthritic bone disease, which would mean they would have to do plastic reconstruction of the joint, a very dangerous and very high risk operation, something I don't want to get into. I have also learned that I can get scarring of the joints through surgery, and I can end up with loss of motion, and so forth (questions of counsel omitted).

We agree with the circuit court's exclusion of this evidence.

¶ 93. Martindale did not establish that the complications of which he spoke were anything more than "remotely conceivable." *Brantner*, 121 Wis. 2d at 666. This was especially problematic because his expert witness did not establish whether any complications were more than remotely conceivable either. Accordingly, we conclude the circuit court did not erroneously exercise its discretion in excluding this testimony.

## VI

¶ 94. We conclude that the circuit court erroneously exercised its discretion when it excluded the testimony of an oral surgeon, testifying as an expert, explaining and describing the probable manner in which the whiplash motion of the plaintiff's head and neck caused injury to the plaintiff's temporomandibular joints (TMJs). This exclusion was critical to the plaintiff's proof of causation and occurred after the circuit court admitted testimony by the expert witness indicating that the TMJ injuries were caused by whip-

lash suffered when the plaintiff's car was struck from behind by a garbage truck. On the facts of this case, the witness was not testifying beyond his expertise, and the evidence concerning the probable manner of injury should not have been excluded. Because the excluded testimony was critical to plaintiff's proof of causation and because the defendant stressed plaintiff's failure to establish causation, the exclusion of this evidence was not harmless error. Although we affirm the circuit court's exclusion of proffered testimony about remotely conceivable complications of possible future surgery to plaintiff's TMJs, we reverse the decision of the court of appeals and remand the cause for a new trial.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded.

¶ 95. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring).* I join the majority opinion. I wrote a concurrence on the issue of harmless error in *In re the Termination of Parental Rights to Jayton S.: Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶¶ 37–42, 246 Wis. 2d 1, 629 N.W.2d 768 (Abrahamson, C.J., concurring). My views on harmless error expressed in that concurrence apply to the present case as well. Rather than repeat the concurrence verbatim in the present case, I refer the reader to the *Evelyn C.R.* case.

¶ 96. JON P. WILCOX, J. *(dissenting).* While I agree with the majority that the circuit court properly excluded the proffered testimony regarding the remotely conceivable complications that could occur if Martindale opted to undergo TMJ surgery, I do not join the majority's conclusion that the circuit court erroneously exercised its discretion by excluding Dr. Ryan's

proffered testimony and diagram regarding the "mechanism" by which Martindale allegedly was injured. Accordingly, I dissent.

I

¶ 97. As the majority explains, the question of whether a witness is qualified under Wis. Stat. § 907.02 (1997–98)[1] to provide an expert opinion is a matter left to the sound discretion of the circuit court. Majority op. at ¶¶ 44–45; *see also State v. Watson,* 227 Wis. 2d 167, 186, 595 N.W.2d 403 (1999). When reviewing a circuit court's decision on a discretionary matter, this court should not examine whether we would have reached the same conclusion as the circuit court. *State v. Wollman,* 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979); *see also* majority op. at ¶ 86. Rather, the appropriate scope of our review is much more limited: "We review a discretionary decision only to determine whether the [circuit] court examined the facts of record, applied a proper legal standard, and, using a rational process, reached a reasonable conclusion. This court will not reverse unless the circuit court's use of discretion is wholly unreasonable." *Watson,* 227 Wis. 2d at 186 (quotation and citation omitted); *see also* majority op. at ¶ 28. Indeed, we generally look for reasons to sustain a circuit court's determination on discretionary matters. *Schauer v. DeNeveu Homeowners Ass'n,* 194 Wis. 2d 62, 71, 533 N.W.2d 470 (1995).

¶ 98. Although the majority in this case professes to adhere to this standard of review, it nonetheless fails to explain on what legal basis the circuit court erred in excluding Dr. Ryan's proffered testimony. Instead, the

[1] All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated.

majority simply reexamines the facts in the record and substitutes its own judgment for the sound discretion of the circuit court.

¶ 99. Had the majority reviewed this case in light of the standard of review that it ostensibly applies, it properly would have concluded that the circuit court reasonably exercised its discretion in excluding Dr. Ryan's proffered evidence regarding the possible "mechanism" by which Martindale may have been injured. The circuit court provided two bases for its decision, both of which are legally sound and either of which should have provided grounds for this court to uphold the circuit court's ruling.

## A

¶ 100. First, the circuit court ruled that Dr. Ryan's testimony lacked foundation. As this court previously has explained, a judge may insist that an expert opinion be supported by some foundation in the record. *Rabata v. Dohner*, 45 Wis. 2d 111, 134–35, 172 N.W.2d 409 (1969); *see also* Wis. Stat. § 904.03 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of. . .misleading the jury. . . .").

¶ 101. In the present case, Martindale attempted to introduce: (1) a diagram allegedly depicting how his head and jaw moved during his accident; and (2) Dr. Ryan's testimony explaining the diagram. Although Dr. Ryan stated that he believed that the diagram accurately depicted Martindale's head and jaw movement, his factual foundation for his belief was extremely limited. As he testified:

Well, I do know which kind of automobile [Martindale] was in. He was in a Bonneville. And I also

119

know that he testified that his—his headrest was too low for his head and that this would depict what could happen in a whiplash injury and I have no other reason to believe that he had an injury to his jaw other than the whiplash injury in this accident. And since I've already testified that I think the accident caused this problem, this is the mechanism of—I believe—causes internal joint derangement.

Thus, in his own words, Dr. Ryan's belief was based on his opinion that the accident caused Martindale's TMJ injury and Martindale's statements regarding his automobile and whiplash injury.

¶ 102. Dr. Ryan's opinion about the cause of Martindale's TMJ injury does not provide an evidentiary basis for his hypothesis regarding how Martindale's head and jaw moved during the accident. To be sure, Dr. Ryan testified without objection that in his opinion, the accident caused Martindale's TMJ injury. This opinion, however, was not based on Dr. Ryan's first-hand knowledge of the accident or Dr. Ryan's understanding of kinematics, physics, or accident reconstruction. Rather, it was simply a matter of common sense deduction based on the facts available to Dr. Ryan. As his testimony indicates, Dr. Ryan began with the factual premises that Martindale had a TMJ injury and was involved in an accident; he then ruled out possible causes for the injury other than Martindale's accident. Syllogistically, Dr. Ryan's reasoning was as follows:

(1) Martindale had a TMJ injury.

(2) Martindale was in an accident that caused a whiplash injury.

(3) Whiplash injuries are caused by head movement.

(4) Head movement can cause TMJ injuries.

(5) Thus, the head movement in the accident could have caused Martindale's TMJ injury.

(6) Dr. Ryan knew of no other possible cause for Martindale's TMJ injury.

(7) Therefore, Dr. Ryan opined that the head movement in the accident caused Martindale's TMJ injury.

At best, this reasoning indicates that Dr. Ryan knew that Martindale's head moved in the accident. But none of this reasoning indicates that Dr. Ryan knew *how* Martindale's head and jaw moved in the accident.

¶ 103. Further, Dr. Ryan's knowledge of Martindale's testimony does not support a conclusion that Dr. Ryan knew how Martindale's head and jaw moved in the accident. Martindale testified about the type of car he was driving and the general facts surrounding his whiplash injury, but he did not explain how his head and jaw moved in the accident with enough precision to allow Dr. Ryan to create a diagram and use it to depict the exact head and jaw movements.

¶ 104. Because Dr. Ryan did not provide any other basis for his opinion, the circuit court reasonably concluded that his diagram and testimony allegedly explaining the exact nature of Martindale's head and jaw movements lacked foundation. Accordingly, the circuit court did not erroneously exercise its discretion in excluding this proffered evidence.

## B

¶ 105. Second, the circuit court ruled that Dr. Ryan's testimony was not given to a reasonable degree of medical probability. Medical opinions must be based on a reasonable degree of probability, not upon mere

possibility, conjecture, or speculation. *Pucci v. Rausch,* 51 Wis. 2d 513, 518–19, 187 N.W.2d 138 (1971). Although there are "[n]o particular words of art" that a medical expert must employ in relating his or her opinion, *Drexler v. All American Life & Cas. Co.*, 72 Wis. 2d 420, 432, 241 N.W.2d 401 (1976), this court has made it clear that " 'might' or 'could' is not sufficient and does not reach the certitude required." *Pucci,* 51 Wis. 2d at 519.

¶ 106. In the case at hand, Dr. Ryan expressed his opinion regarding Martindale's head and jaw movements in terms of mere possibility, conjecture, or speculation: "[T]his would depict what *could* happen in a whiplash injury." (Emphasis added.) Dr. Ryan did not explain whether there are other types of whiplash injuries that involve different head and/or jaw movements, and, if so, whether those types of whiplash injuries can cause TMJ injuries. Nor did he attempt to explain with what frequency the type of movement depicted in his diagram actually causes TMJ injury. Rather, Dr. Ryan merely asserted in uncertain terms that the movements shown in his diagram *could* have occurred in the accident at issue and, if so, Martindale's TMJ injury could have resulted. This does not reach the required level of certitude necessary to form an admissible opinion.

¶ 107. The majority attempts to make an end-run around this shortcoming by scouring Dr. Ryan's deposition transcript for testimony that did reach the requisite degree of certitude. As a result of its efforts, the majority does manage to find such testimony: twenty-six pages and seventy-five questions earlier in the transcript, Dr. Ryan testified "to a reasonable degree of probability" that in his opinion, Martindale's accident had caused the TMJ injury. *See* majority op. at

¶ 67 (quotation omitted). As explained above, this testimony is not disputed. But as also explained above, it does not follow from this testimony that Dr. Ryan had knowledge about how Martindale's head and jaw allegedly moved during the accident sufficient to warrant introducing Dr. Ryan's "mechanism" diagram and testimony to the jury.

¶ 108. The fact remains that with regard to the testimony and diagram at issue (not another question at another point in Dr. Ryan's testimony), Dr. Ryan failed to testify with the requisite degree of certainty. He provided the opinion at issue only in terms of possibility, conjecture, and speculation—as what *could* have happened. As such, the circuit court reasonably concluded that Dr. Ryan's diagram and testimony should be excluded. Accordingly, as with the foundation ruling discussed above, the circuit court did not erroneously exercise its discretion.

## II

¶ 109. Seemingly driven by a desired outcome rather than its professed adherence to the appropriate standard of review, the majority ignores the circuit court's reasoning and, instead, engages in legal gymnastics. First, rather than initially finding that the circuit court's ruling was in error, the majority begins its analysis with a harmless error standard. As the majority explains, "[a]fter recognizing Dr. Ryan's credentials, permitting him to testify as an expert, and allowing him to give his opinion as to the cause of Martindale's medical condition, the court denied [Dr. Ryan] the ability to explain the 'mechanism' that prompted him to reach his conclusion." Majority op. at ¶ 46. In light of these facts, the majority suggests that Martindale was prejudiced because the jury never

received an explanation of how a whiplash injury can relate to a TMJ injury. *Id.* Thus, the majority suggests that the circuit court ruling affected the substantial rights of Martindale without first finding that the ruling was incorrect.

¶ 110. The majority's analysis is flawed. Not only does the majority's analysis beg the questions of whether Dr. Ryan's "mechanism" diagram and testimony lacked foundation and/or the requisite degree of certainty, but it is based on circular logic. In effect, the majority's logic is that the circuit court's ruling was in error because it was not harmless error (*i.e.*, it affected Martindale's substantial rights). Pursuant to this prejudice-first analysis, even if the majority had concluded that the circuit court ruling was correct and was the only reasonable ruling in this case, so long as the ruling could cause Martindale to be prejudiced, the majority would be compelled to reverse. This is not our law.

¶ 111. There is no doubt that Dr. Ryan was an expert. But an expert qualified to testify on one subject is not necessarily qualified to testify on another—even a closely related—subject. *See Lemberger v. Koehring Co.*, 63 Wis. 2d 210, 217–18, 216 N.W.2d 542 (1974). Simply because the circuit court ruled that Dr. Ryan was qualified to provide an opinion regarding the cause of Martindale's TMJ injury, it does not necessarily follow that the circuit court was in error when it concluded that Dr. Ryan was not qualified to opine about the physical mechanics surrounding Martindale's alleged head and jaw movement during the accident. As explained above, based on the facts in the record, the circuit court reasonably excluded this latter proffered evidence. *Accord Simpsen v. Madison Gen. Hosp.*, 48 Wis. 2d 498, 510–11, 180 N.W.2d 586 (1970)

124

(affirming the circuit court's decision to allow a doctor to testify about injuries, but not about the possible causes of those injuries).[2] Consequently, the circuit court's ruling was not in error and the majority should not have reached the harmless error analysis.[3]

[2] In an attempt to undermine the precedential value of *Simpsen v. Madison Gen. Hosp.*, 48 Wis. 2d 498, 180 N.W.2d 586 (1970), the majority asserts that *Simpsen* is inapposite to the present case because *Simpsen* involved a podiatrist while the present case involves an oral surgeon. *See* majority op. at ¶ 56 n.9. I cannot discern that this negligible factual distinction undermines the precedential value of *Simpsen*. *Simpsen*, like the present case, involved a licensed, well-seasoned doctor who had experience in diagnosing and treating the type of injury at issue, who had treated the plaintiff after (and before) she was injured, and who had consulted with another doctor who had treated the plaintiff. *Simpsen*, 48 Wis. 2d at 509–10. Nevertheless, the circuit court in *Simpsen*, like the circuit court in the present case, ruled that although the doctor was qualified to testify as an expert regarding some aspects of the plaintiff's injuries, he was not qualified to testify about all aspects of the plaintiff's injuries. *Id.* at 509. As this court should have done with regard to the circuit court's ruling in the present case, this court affirmed the circuit court's sound discretionary decision in *Simpsen*. *Id.* at 511.

As noted above, the mere fact that a witness is qualified to testify as an expert on one issue does not mean that the witness is qualified to testify as an expert on another—even a closely related—issue. *Lemberger v. Koehring Co.*, 63 Wis. 2d 210, 217–18, 216 N.W.2d 542 (1974). The circuit court in the present case, like the circuit court in *Simpsen*, recognized this rule of law.

[3] As the court of appeals noted, Martindale knew well in advance of the trial that the evidence at issue was not admissible. *Martindale v. Ripp*, No. 99–0649, unpublished slip op. at ¶ 8 (Wis. Ct. App. Oct. 28, 1999). The circuit court made its ruling on June 8, 1998, approximately three months prior to the Sep-

¶ 112. And second, the majority puts an irrational spin on the facts of this case. According to the majority, Dr. Ryan "did not try to describe exactly what happened inside Martindale's car. . . .His testimony and the accompanying exhibit were intended to explain to the jury how Dr. Ryan believed Martindale's [alleged] injuries occurred." Majority op. at ¶ 55.

¶ 113. I cannot discern how the majority harmonizes these "facts." On one hand, the majority suggests that Dr. Ryan did not intend to explain how Martindale's head and jaw moved during the accident. On the other hand, it suggests that Dr. Ryan intended to explain how he believed Martindale's injuries occurred—*i.e.*, how Martindale's head and jaw moved during the accident. I fail to understand this reasoning. To explain how Martindale's injury occurred by means of anything more than a generic statement that the accident caused Martindale's injury, Dr. Ryan necessarily would have to explain precisely how Martindale's head and jaw moved during the accident. He is not qualified to do so.

¶ 114. For these reasons, I not only am troubled by the fact that the majority has reversed a reasonable discretionary decision by the circuit court, but I also am troubled that the majority has replaced the circuit

tember 11, 1998, commencement of the trial. With such advance notice that Dr. Ryan's diagram and deposition testimony would be partially excluded, Martindale could have sought to have Dr. Ryan testify at trial in order to bolster his opinion or asked the circuit court to permit another qualified expert to testify. Martindale did not pursue either option. Rather, he chose to try the case without the evidence that he now claims to have needed. In light of these facts and the facts discussed above, I would conclude that it was Martindale's inaction—not the circuit court's ruling—that hurt Martindale's case.

court's reasonable discretionary decision with specious logic and irreconcilable statements of "fact."

### III

¶ 115. The majority in this case has overstepped the bounds of the appropriate standard of review. This court does not and cannot conclude that the circuit court's ruling was "wholly unreasonable." *See Watson,* 227 Wis. 2d at 186 (quotation and citation omitted). Rather, at best, the majority simply concludes that the circuit court could have made another "reasonable"—albeit less reasonable—ruling. Thus, in the place of the circuit court's sound discretionary decision, the majority has injected as a matter of law its determination of how, were it the circuit court, it would have decided the question of whether to admit Dr. Ryan's testimony.

¶ 116. I will not join the majority's usurpation of the circuit court's discretionary authority. For this reason, I respectfully dissent.

¶ 117. I am authorized to state that Justice N. PATRICK CROOKS joins this dissent.

¶ 118. N. PATRICK CROOKS, J. *(dissenting).* While I join Justice Jon P. Wilcox's dissent, I write separately to express my concerns about the majority's standard for harmless error. *See* majority op. at ¶ 32. The majority's standard is whether there is "a reasonable possibility that the error contributed to the outcome," and that a "reasonable possibility" is one "sufficient to 'undermine confidence in the outcome.' " *Id.* (quoting *State v. Dyess,* 124 Wis. 2d 525, 544–45, 370 N.W.2d 222 (1985)). Since the standard for harmless error is the same for civil, as well as criminal, cases

(*Town of Geneva v. Tills*, 129 Wis. 2d 167, 184–85, 384 N.W.2d 701 (1986)), it is imperative that the standard be accurately conveyed.

¶ 119. For at least the past 35 years, this court has wrestled with formulating a standard for harmless error. *See, e.g., Pulaski v. State*, 24 Wis. 2d 450, 456–57, 129 N.W.2d 204 (1964); *State v. Spring*, 48 Wis. 2d 333, 339–40, 179 N.W.2d 841 (1970); *Wold v. State*, 57 Wis. 2d 344, 356–57, 204 N.W.2d 482 (1973); *State v. Grant*, 139 Wis. 2d 45, 406 N.W.2d 744 (1987). In an attempt to formulate a single, uniform test for harmless error, *Dyess* "conclude[d] that the test of prejudice as formulated in *Strickland* subsumes the various statements of the harmless error test that this court has used over the years." *Dyess*, 124 Wis. 2d at 545.[1] The *Strickland* case referred to is *Strickland v. Washington*, 466 U.S. 668, 693 (1984), and the test is whether "there is a *reasonable probability*" that "but for" the error, "the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694 (emphasis added). *Dyess* obviously adopted that test, but incorrectly assumed that there was no real difference between using "reasonable possibility" instead of "reasonable probability." 124 Wis. 2d at 544. Granted,

---

[1] *Dyess*' single test for harmless error standard has not been without controversy. *State v. Dyess*, 124 Wis. 2d 525, 370 N.W.2d 222 (1985). In addition to the majority opinion's discussion of *Dyess*' harmless error standard, authored by Justice Day, in *State v. Grant*, 139 Wis. 2d 45, 406 N.W.2d 744 (1987), Chief Justice Heffernan, Justice Day, Justice Abrahamson, and Justice Callow separately concurred on the *Dyess* issue. The controversy has continued. *See State v. Dodson*, 219 Wis. 2d 65, 92–98, 580 N.W.2d 181 (1998) (Crooks, J., concurring, joined by Justice Steinmetz and Justice Wilcox).

*Dyess* applied its test by stating that "[i]n the present case, the *probability* to be weighed is whether the defendant would have been acquitted." *Id.* at 546 (emphasis added). However, as evident in the majority's opinion here today,[2] Wisconsin courts have frequently used the term "reasonable possibility," and have not indicated that, in the context of a harmless error standard, possibility means probability.[3]

¶ 120. There can be no doubt that there is a significant difference between what is reasonably probable and what is reasonably possible. "A possibility test is the next thing to automatic reversal." *Wold v. State*, 57 Wis. 2d 344, 356–57, 204 N.W.2d 482 (1973).[4] While I agree that the focus should be "on whether the

[2] *See also Green v. Smith & Nephew AHP, Inc.*, 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727; *Koffman v. Leichtfuss*, 2001 WI 111, 246 Wis. 2d 31, 630 N.W.2d 201; *Evelyn C.R. v. Tykila S.*, 2001 WI 110, 246 Wis. 2d 1, 629 N.W.2d 768; and *Nommensen v. American Cont'l Ins. Co.*, 2001 WI 112, 246 Wis. 2d 132, 629 N.W.2d 301. (I have written dissents or concurrences in these cases.) *But see State v. Lindell*, 2001 WI 108, 245 Wis. 2d 689, 629 N.W.2d 223 (*Strickland*'s probability sufficient to undermine the confidence in the outcome test used to determine ineffective assistance of counsel claim).

[3] According to my research, on few occasions since *Dyess* has this court, in a majority opinion, noted that reasonable possibility means reasonable probability. *See State v. Armstrong*, 223 Wis. 2d 331, 372 n.40, 588 N.W.2d 606 (1999); *see also State v. Huntington*, 216 Wis. 2d 671, 695–96, 575 N.W.2d 268 (1998). However, several court of appeals opinions have applied the *Dyess* harmless error test using the correct "reasonable probability" standard. *See, e.g., State v. A.H.*, 211 Wis. 2d 561, 569, 566 N.W.2d 858 (Ct. App. 1997); *State v. Joseph P.*, 200 Wis. 2d 227, 237, 546 N.W.2d 494 (Ct. App. 1996).

[4] *Wold*'s "reasonable probability" test for harmless error was replaced by *Dyess*' "reasonable possibility" test.

error 'undermine[s] confidence in the outcome,'" (*Dyess*, 124 Wis. 2d at 545 (*quoting Strickland*, 466 U.S. at 694)), if that error need only possibly undermine the confidence in the outcome, rather than probably, appellate courts, and circuit courts considering motions after verdict and post-convictions motions, will find themselves invading the purview of the jury. A cornerstone of the common law is deference to the jury, which is diluted by determining whether the alleged error possibly, and only possibly, may have affected the jury's decision.

¶ 121. I do not take issue with the term "reasonable possibility," so long as it is made clear that this term means reasonable probability, and probability is the standard to be applied. Accordingly, I offer the following test for harmless error, which makes clear that *Dyess*' use of the term "reasonable possibility" is intended to require "reasonable probability":

> Wisconsin Stat. § 805.18(2) provides that an error requires reversal only where it has "affected the substantial rights of the party" claiming error. We have long recognized that the focus of a court's analysis under this statute is whether, in light of the applicable burden of proof, the error is significant enough to "undermine confidence in the outcome" of the trial. *Dyess*, 124 Wis. 2d at 544–45. An error is significant enough to undermine confidence in the outcome if there is a reasonable probability of a different outcome without the error. *Dyess* made it clear that "probability" is substantially the same as "possibility" under Wisconsin law. *Id.* at 544.

¶ 122. That Wisconsin courts have often used "reasonable possibility" rather than "reasonable probability" should not dissuade the court from correcting such missteps today. *See, e.g., State v. Sullivan*

216 Wis. 2d 768, 792, 576 N.W.2d 30 (1998); *State v. Alexander*, 214 Wis. 2d 628, 653, 571 N.W.2d 662 (1997). There is no time like the present—*dum fervet opus*[5]—when the court has before it five cases wherein it discusses the harmless error standard, to clarify *Dyess*.

¶ 123. For the reasons stated herein, I respectfully dissent.

¶ 124. I am authorized to state that Justice JON P. WILCOX joins this opinion.

---

[5] "While the action is fresh; in the heat of action." *Black's Law Dictionary* 518 (7th ed. 1999).