COURT OF APPEALS
DECISION
DATED AND FILED

March 13, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2023AP1359**

Cir. Ct. No.  2021ME204

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

IN THE MATTER OF THE MENTAL COMMITMENT OF G.M.M.:

WAUKESHA COUNTY,

  PETITIONER-RESPONDENT,

 V.

G.M.M.,

  RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Waukesha County: LAURA F. LAU, Judge. *Affirmed*.

¶1    GUNDRUM, P.J.[1]  G.M.M., referred to herein by the pseudonym Gina Miller, appeals from an order of the circuit court extending her involuntary commitment under WIS. STAT. ch. 51.  Relying upon *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277, she contends the court erred in entering the order because the court "failed to make specific factual findings" as to dangerousness.  We affirm because we conclude that the court's factual findings were sufficient but even if they were not, any error was harmless.

## *Background*

¶2    Following an uncontested hearing, the circuit court ordered Miller committed on May 11, 2021, pursuant to WIS. STAT. ch 51.[2]  Following a contested recommitment hearing on November 2, 2021, the court extended Miller's commitment.[3]  On September 28, 2022, the County filed a petition to further extend the commitment order.  The following relevant evidence was presented at the October 25, 2022 contested hearing on that petition.

¶3    On behalf of the County, a "clinical therapist"/"licensed clinical social worker" for the County, Danielle Weber, testified that Miller's original commitment in May 2021 was prompted by incidents that began on the first of that

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] In addition to ordering Miller committed, the circuit court entered an order allowing the County to involuntarily medicate and treat Miller.  With every extension of Miller's commitment, the court entered a corresponding medication order.  Here, Miller does not present any argument relating to the October 25, 2022 medication order.  Thus, we will not address the medication order separately.

[3] Miller appealed, and we affirmed her commitment and medication orders in January 2023.  *Waukesha County v. G.M.M.*, No. 2022AP1207, unpublished slip op. (WI App Jan. 18, 2023).

month. The police had been called to Miller's apartment five times that day "due to her causing a disturbance and yelling. It was reported that she believed birds outside of her window were talking to her and threatening to kill her." Miller "had also made reference at that time that her sister was not actually her sister, but someone from the Iranian government wearing a mask and pretending to be her sister." The following day, police were again called because Miller believed her sister, with whom Miller lived, "was talking about her on the phone to someone else," and Miller "grabbed the phone receiver and hit [her sister] in the face or cheek causing her harm." Miller "also threw a remote and was slamming doors," and she told responding officers that radio waves were "communicating with her through the TV." Miller was "described as making incoherent statements." Following this, Miller had an "inpatient stay" for three weeks and since that stay has been back living with her sister on an outpatient basis.

¶4    Weber further testified that Miller has consistently expressed she does not believe she has a mental illness and "that she does not need psychotropic medication, and that they do not help her. [Miller] has been unable to correlate her long-acting injection with her ability to stay out of an inpatient setting." Miller has further stated "she will only take medications if court ordered to do so." Weber expressed concern that Miller "will stop treatment and decompensate, and become a harm to herself or her sister again in the future."

¶5    Weber testified, without objection, that nurse practitioner Mercy Mahaga, Miller's treatment provider since Miller transferred from inpatient to outpatient care, opines that Miller suffers from schizophrenia and "lacks insight into her disorder and need for treatment." Miller's condition is treated with "a long-acting injection of Invega Sustenna." Weber agreed that the treatment records indicate Mahaga had spoken with Miller "about the advantages,

3

disadvantages, and alternatives" to the medication. Weber stated that Mahaga opines that Miller is "[not] capable of making medication decisions on her own."

¶6    Weber stated that even while on the injectable medication, Miller

> continues to report auditory hallucinations. The voices that she has named Ann and Ed. She believe[s] that she had a device implanted into her ear that allows her to hear the voices that other people cannot. She also has had some delusions regarding ongoing infections. She believes she has had an ongoing bladder infection since she was [in] the 9th grade that she has not sought treatment for.

Weber agreed that Miller's "aggressive or agitated type symptoms dissipated since [she began receiving] the injectable." Weber acknowledged no concerns regarding Miller's ability "to make physical health related decisions or financial decisions for herself."

¶7    On cross-examination, Weber stated she had only met in person with Miller once, on August 9, 2022, for approximately ten to fifteen minutes, and she acknowledged she does not "have concerns regarding the need for a guardianship" for Miller. Weber testified she was not aware if the May 2021 phone incident caused any noticeable marks on the face of Miller's sister or if the sister sought medical attention due to the incident.

¶8    On redirect examination, Weber confirmed that the statement of emergency detention by law enforcement indicated that Miller's sister described Miller's actions as

> volatile as she is screaming at the top of her lungs throughout the day. When [Miller] became physical today, [the sister] called the police as she felt that [Miller] was a danger to her, and [Miller] was stating "I will protect my life." These actions caused concern as [the sister] no longer feels safe with [Miller] in the home.

¶9    Doctor Cary Kohlenberg, a psychiatrist, testified next for the County. He conducted a telephonic evaluation of Miller on October 10, 2022, and had, on two prior occasions in 2021, met with her for an evaluation. Kohlenberg had also reviewed "the updated recommitment report" for Miller, as well as his files from his prior evaluations with her and "records from Winnebago as well as the initial emergency detention and … police report."

¶10    Kohlenberg stated Miller suffers from schizophrenia, which, as to her, manifests as a disorder of thought, mood, and perception and, he agreed, "grossly impair[s] [her] judgment, behavior, capacity to recognize reality, her ability to participate in the ordinary affairs of life." He explained that "[p]rior to treatment, she was experiencing significant mood lability, anger lability, delusional beliefs, and auditory hallucinations. The symptoms have greatly reduced over the course of her treatment but have not completely disappeared." In response to the County's request for elaboration regarding Miller's delusional beliefs, Kohlenberg stated:

> As documented at the time of her initial detention, she was making known her delusional beliefs including that birds she could see from the window and she could hear chirping, and this was somehow telling her that they were going to kill her. And she also expressed delusional beliefs that her sister was somehow involved in the Iranian government and had killed their parents.

He added that Miller's delusional beliefs "basically prevent[] her from rationally analyzing information in order to make sound decisions."

¶11    Related to auditory hallucinations, Kohlenberg testified that when he met with Miller weeks prior, she spoke of

> someone or something putting audio in her ear. She wouldn't specify who was doing what or saying what. She did connect it possibly to a neighbor, but she would not

5

specify exactly what she was hearing, but it was clear she was experiencing auditory hallucinations and from the past in the record review.

He further explained that such hallucinations "will inappropriately affect [a person's] ability to critically analyze information and make sound decisions."

¶12 Discussing the early May 2021 incident in which Miller, as Kohlenberg understood it, was yelling and threw something at her sister, Kohlenberg stated that Miller's symptoms were "exacerbated" at that time and that her violent conduct toward her sister "was directly the result of impaired judgment." He agreed medication is necessary to improve Miller's "substantial disorder of thought, mood, and perception," adding that the medication has "been extremely helpful over the past approximate one and one-half years." Because of the medication, he noted, "she has not been experiencing the behavioral symptoms or aggression that she has previously."

¶13 Kohlenberg testified that he "really could not engage [Miller] in a meaningful discussion" as to treatment options "[b]ecause [she] does not believe that she has any underlying mental illness except perhaps situational depression." "So," Kohlenberg stated, he "basically listed these things for her." He again stated that Miller does not believe she has a mental illness and feels she "does not need to be on these medications." He agreed that Miller is "substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to her condition in order to make an informed choice as to whether to accept or refuse the recommend[ed] medication or treatment." When asked if Miller would voluntarily avail herself of services in the community that would reduce dangerousness if she was "off of commitment," Kohlenberg stated that he asked Miller several times if "she would take medication as directed to do so by a private

doctor, and she would not directly answer that question." Kohlenberg stated his belief that "because she does not feel she has any mental illness, that if not for commitment, she would likely not take any mental health medication," and he agreed that if treatment were withdrawn, she would become a proper subject for treatment. He explained that when he discussed alternatives with Miller, those alternatives "included other injectable antipsychotics, other oral antipsychotics, or the un-recommended alternative of no antipsychotic medication." Related to oral antipsychotics, Miller "again stated she does not believe she needs or benefits from any medication, oral or injectable."

¶14 On cross-examination, Kohlenberg further explained that because Miller "does not believe she needs or benefits from the current injectable antipsychotic" and "would not directly answer [his] question about what she would do if a private psychiatrist of her choice would recommend any kind of antipsychotic," he believes "she would not take it voluntarily." He acknowledged, however, that Miller had expressed to him that she may have clinical depression, and if she were off commitment, she would "work with" a doctor and/or counselor of her own choosing. He acknowledged that she has not engaged in violent behavior since her initial commitment.

¶15 Miller also testified. Regarding the early May 2001 incident, she stated that

> [e]verything I said got twisted around. My neighbors were being so utterly obnoxious. For a month they had been talking bird[ie] talk, and that's who was talking bird[ie] talk was my neighbors. Making comments about me, my looks, my weight, other inappropriate comments. I haven't been outside in four years at that point due to my heart condition which leaves me confined to a chair.
>
> I'm completely disabled by my heart condition. Also bacterial infection with no health insurance. I didn't even

have a telephone. Just left to suffer all alone year after year and forced to listen to all of this. Unfortunately, my sister exacerbated the problem when she came out talking down to me.

.…

She was talking to my brother on the phone as if I was some sort of dysfunctional. I just wanted the abuse of me to stop…. So I grabbed the phone away from her. If the phone brushed her face in any way, I'm very sorry. It wasn't my intent to hurt my sister. I would never hurt my sister or anyone else, Your Honor.

Miller added that "things are very good right now. Things are back to the way they used to be, likewise, with all my brothers and sisters. Everything is back to where it always used to be, my normal disposition."

¶16    In its closing arguments, the County began by emphasizing that Miller "stipulate[d] and agree[d] to facts supporting dangerousness" when she was initially committed following the May 2021 incident. It then criticized that "then almost a year and a half later[, Miller] come[s] to court and say[s], oh, I take it back. Those facts weren't really true, and the Court should have not used them to support the stipulation that happened." The County continued:

[T]he Public's facts regarding dangerousness in this case, are the facts on [sic] May of 2021, and it is our position … that it's that antipsychotic, it's that chemical administration treatment that is preventing the behaviors from happening that happened in May of 2021.

And those behaviors are important for this Court to rely upon when deeming her to be a danger under the impaired judgment standard.

The County then specifically recounted the hearing testimony as to Miller's delusional expressions and aggressive actions in early May 2021, before again reminding the circuit court that

> [s]he stipulated back in May of 2021 that that was dangerous at that point in time, and now we're trying to re-litigate whether those are still sufficient, when really the question is, is she going to avail herself [of] services? Is she going to continue to take this injection if she gets off of commitment? And the overwhelming evidence for this point in time is that she is not going to do it, because she lacks insight into her mental illness.

The County also emphasized Kohlenberg's discussion with Miller about the possibility of taking an oral antipsychotic medication, "a le[ss] restrictive measure" than an injection, but that Miller "still did not have insight into the need for" that.

¶17     Counsel for Miller argued that in terms of dangerousness,

> [w]hat we have, two years ago, is a remote got thrown, and a phone got grabbed.
>
> … And we have someone who's been out of the hospital now for a long period of time and has not had further dangerous behavior. And I know that the County doesn't need to show further dangerous behavior if what they have supports the argument that but for this commitment, we would be back right where we were.
>
>     I think the argument that we're still having auditory hallucination actually works against [the] County's argument…. [S]ymptoms of a mental health issue without dangerousness don't equate to a need to continue the commitment.
>
>     We have a woman here who has remained in the community, is living in a family home that she's lived in for a long period of time, and who the Department says doesn't qualify for guardianship. They believe because she disagrees with them on how much help her medication is, that she is not competent to decide her medication, but she is competent for all other medical decisions. That's somewhat intellectually inconsistent.
>
>     So I think when you look at her history, the minimal level of dangerousness that is stipulated to by my client at the initial hearings, and her progress since then, I don't believe we have a record that establishes dangerousness that requires an extension of her commitment.

Counsel further added her belief that "at this point in time[, Miller] is able and willing to access treatment on her own."

¶18 The circuit court spoke next, noting that while Miller "has made strides in her life … there's just a lack of understanding of the extent of the mental illness." The court continued:

> [F]rom Dr. Kohlenberg, really what the Court got was that [Miller] does not believe or embrace the schizophrenia diagnosis, and the [C]ourt does feel that in accordance with what the Public said, that it's the medication that she's currently taking is what put her in this … good state.
>
> The problem is I do not believe that Ms. [Miller] would avail herself of medication if she were not subject to the commitment. And so the Court does find grounds for extension of the commitment, finding that Ms. [Miller] is mentally ill and is dangerous because she has a substantial probability of physical impairment or injury to herself or others due to impaired judgment. When I talk about the impaired judgment, it's really related to her lack of insight into her mental illness.
>
> This is manifested or shown by a substantial likelihood based on her treatment record that she would be a proper subject for commitment if treatment were withdrawn. She is a proper subject for treatment …. Dangerousness is likely to be control[l]ed with appropriate medication, which I believe we've seen, and we really want that to continue.

¶19 The circuit court ordered the extension of Miller's commitment and the continued involuntary administration of medication and treatment. Miller now appeals the order extending her commitment.

### *Discussion*

¶20 We do not disturb a circuit court's findings of fact unless they are clearly erroneous, and we accept all reasonable inferences from those facts. *Outagamie County v. Melanie L.*, 2013 WI 67, ¶38, 349 Wis. 2d 148, 833

N.W.2d 607. "[W]hether the facts satisfy the statutory standard" of dangerousness is a question of law we review independently. ***D.J.W.***, 391 Wis. 2d 231, ¶¶25, 47.

¶21 An individual is a proper subject for recommitment under WIS. STAT. § 51.20(1) if the County proves by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous. *See* ***D.J.W.***, 391 Wis. 2d 231, ¶31; § 51.20(13)(e). On appeal, Miller only challenges the circuit court's determination that she is dangerous. "Dangerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions." ***Winnebago County v. S.H.***, 2020 WI App 46, ¶13, 393 Wis. 2d 511, 947 N.W.2d 761.

¶22 The County sought to establish dangerousness under the third standard "by way of the recommitment alternative," i.e., under WIS. STAT. §§ 51.20(1)(a)2.c. and (1)(am). *See* ***Sauk County v. S.A.M.***, 2022 WI 46, ¶32, 402 Wis. 2d 379, 975 N.W.2d 162.

> Under those two provisions, the County's burden was to show a substantial likelihood, based on [Miller's] treatment history, that if treatment were withdrawn [s]he would again face "a substantial probability of physical impairment or injury to [herself or other individuals]" and that there is either no "reasonable provision for [her] protection … available in the community" or that [Miller] would not, to a "reasonable probability," "avail [herself] … of these services."

***Id.***

¶23 Miller contends the circuit court erred because it "failed to make specific factual findings" in connection with its determination that she is "dangerous" under WIS. STAT. §§ 51.20(1)(a)2.c. and (1)(am). More specifically,

she complains the court "made no factual findings regarding testimony about the only incident in the court record that involved any potential dangerousness," that being the May 2021 incident. To be clear, Miller does not contend the evidence presented by the County was insufficient to support the court's determination that Miller is currently dangerous; rather, she only argues we should reverse the court's order because the court failed to sufficiently state findings to support its legal determination that she is currently dangerous. Miller further asserts the court failed to sufficiently make factual findings "in regards to [her] willingness to work with treatment providers on a voluntary basis."[4]

¶24    Although Miller does not argue that the evidence is insufficient to support the circuit court's determination that she is currently dangerous, we nonetheless first conclude that the evidence presented by the County sufficiently supports that determination. Based on the evidence, Miller was extremely agitated and behaving irrationally in May 2021, which led her to slam doors, throw a "remote"[5] and even physically remove a phone from her sister's hand, causing it to hit her sister in the face. Kohlenberg testified that this behavior resulted from

---

[4] Miller also contends the circuit court failed to make specific factual findings "explain[ing] why [the antipsychotic medication she was being involuntarily administered] was the only 'reasonable provision' available for [her] protection in the community." This "reasonable provision" language is found in an exception to WIS. STAT. § 51.20(1)(a)2.c.: "The probability of physical impairment or injury is not substantial under this subd. 2.c. if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services …." Because Miller directs us to nothing outside of this exception that required the court to find that antipsychotic medication is "the only 'reasonable provision' available for [Miller's] protection in the community" and because the exception does not apply here as the evidence did not establish a reasonable probability Miller would avail herself of services available for her protection, this issue goes nowhere.

[5] Kohlenberg testified that he believed Miller threw something (perhaps the "remote") "at" her sister.

Miller's delusional beliefs and that Miller believed her sister was somehow involved in the Iranian government and had killed their parents. The testimony also indicated Miller would likely not take medication if not ordered to do so and that she would then revert to her dangerous pre-medicated state. The evidence thus supports the circuit court's determination that Miller "would be a proper subject for commitment [under one of the five dangerousness standards (specifically, WIS. STAT. § 51.20 (1)(a)2.c.)] if treatment were withdrawn." *See S.A.M.*, 402 Wis. 2d 379, ¶5.

¶25     Related to Miller's criticism that the circuit court failed to "[make] specific factual findings concerning [the May 2021] incident," Miller intimates that because she testified that she "grabbed the phone away from [her sister]. If the phone brushed her face in any way, I'm very sorry" and Kohlenberg and Weber testified, respectively, that Miller "threw something" at her sister and "[Miller] grabbed the phone receiver and hit [her sister] in the face or cheek causing her harm," the court had to determine what actually occurred. Miller, however, had stipulated at her first commitment hearing in May 2021 to her conduct and that her conduct established dangerousness under the third standard. Additionally, the circuit court found at that hearing that Miller's behavior met the standard.

¶26     Related to Miller's contentions that the circuit court failed to make sufficient factual findings regarding dangerousness as well as her "willingness to work with treatment providers on a voluntary basis," we note that the testimony addressed whether Miller was likely to avail herself of community resources available for her protection. Kohlenberg testified, as the circuit court found, that Miller's current "good state" was the result of her taking the medication necessary to control her symptoms and that if she is not under commitment, with a

corresponding medication and treatment order, she will not continue to take the medication. The implication is that she would then likely revert to the condition she was in prior to her current "good state." While the court certainly could have more clearly articulated what it meant by "good state," it is clear from the context of the court's comments, as the County points out, that the "good state" the court referred to derived from the fact that while taking the medication, Miller is not dangerous. This is in contrast with her state before the medication, a state which led to behavior Miller previously stipulated satisfied the statutory dangerousness standard. This contrast with Miller's pre-medication "state" is highlighted by the court's initial comments in which it noted that Miller had "made strides in her life, and her presentation today is really, it's someone who's very pleasant and sort of mildmannered and low-keyed." It is immediately after these comments that the court then discusses Miller's "lack of understanding of the extent of [her] mental illness" and how it is "the medication that she's currently taking" that "put[s] her in this … good state." The court further added that Miller's "[d]angerousness is likely to be control[l]ed with appropriate medication, *which I believe we've seen*, and we really want that to continue," but it expressed that the evidence, particularly the evidence related to Miller's "lack of understanding of the extent of [her] mental illness" and specifically the evidence "from Dr. Kohlenberg," indicated that Miller "does not believe or embrace the schizophrenia diagnosis." (Emphasis added.) The court concluded that because Miller does not believe the diagnosis or that the medication is what "put her in this … good state," she "would [not] avail herself of medication if she were not subject to the commitment."

¶27 Miller directs us to no law indicating the circuit court's order must be reversed because the court failed to make the specific findings Miller claims the court should have made. The court sufficiently echoed the compelling evidence

the County presented—that Miller does not have insight into or understand that her schizophrenia prevents her from rationally seeing the world, and it explained how her illness prevents this. The evidence indicated, as the court found, Miller would not continue to receive her medication without a commitment and corresponding medication and treatment order. Miller had the opportunity during her testimony to counter the County's evidence and convince the court she would continue to take the medication, or some other prescription medication for her schizophrenia, even if she were not under the commitment order, and yet did not do so.

¶28    While the circuit court could have said more regarding Miller's dangerousness and lack of willingness to voluntarily get the treatment she needs—which may have avoided this appeal altogether, considering that the parties did not dispute Miller's May 2021 behavior or that the behavior established her dangerousness, and Miller had previously stipulated that dangerousness had been established—the court said enough.

¶29    Miller rests her appeal almost entirely upon our supreme court's statement in *D.J.W.* that "going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of [WIS. STAT.] § 51.20(1)(a)2. on which the recommitment is based." *D.J.W.*, 391 Wis. 2d 231, ¶40. From this, she argues the circuit court's order here must be reversed because the court did not say enough.

¶30    Because of the significant differences between *D.J.W.* and this case, we do not see *D.J.W.* as controlling the outcome of Miller's appeal. In *D.J.W.*, the court reviewed whether the County had presented sufficient evidence at the recommitment hearing to support an extension of D.J.W.'s involuntary

commitment. *Id.*, ¶1. The court noted that "[i]n a recommitment proceeding, the burden is on the County to prove by clear and convincing evidence all required facts," including that the committee is "dangerous to themselves or others," which may be shown by proving dangerousness under any of the five standards of WIS. STAT. § 51.20(1)(a)2. or the "additional manner of proving dangerousness provided by … § 51.20(1)(am)." *D.J.W.*, 391 Wis. 2d 231, ¶¶23, 29, 31-32. Significantly, the *D.J.W.* decision was driven by the fact that "[i]t was not clear at either the initial commitment hearing or the extension hearing on which subdivision paragraph of … § 51.20(1)(a)2. the commitment was based." *Id.*, ¶36.

> In affirming the initial commitment, the court of appeals specifically determined that the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. under which commitment was appropriate was § 51.20 (1)(a)2.d.…
>
> ….
>
> In the court of appeals in the present appeal, the County's brief did not cite any specific subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. under which it argued that D.J.W. was dangerous….
>
> However, in its oral argument before this court, the County apparently took a new tack and asserted that D.J.W. would be a proper subject for a commitment in the event treatment were discontinued not under subd. para. 2.d., but under 2.c.…
>
> The record in this case is therefore quite unhelpful in guiding this court's analysis. We have received conflicting messages from the County and the court of appeals regarding the statutory basis for this commitment. *In order to avoid this problem* in the future, we determine that going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of § 51.20(1)(a)2. on which the recommitment is based.

***D.J.W.***, 391 Wis. 2d 231, ¶¶37-40 (emphasis added). The court further added that § 51.20(1)(am) "mandates that circuit courts ground their conclusions in the subdivision paragraphs of subd. 2." ***D.J.W.***, 391 Wis. 2d 231, ¶41.

¶31 The ***D.J.W.*** court emphasized that "the purpose of making specific factual findings with reference to a subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. is" to "provide[] clarity and extra protection to patients regarding *the underlying basis* for a recommitment," "provide[] increased protection to patients to ensure that recommitments *are based on sufficient evidence*," "clarify issues raised on appeal of recommitment orders and ensure the soundness of judicial decision making, *specifically with regard to challenges based on the sufficiency of the evidence*," and relatedly provide "[a] more substantial record [that] will better equip appellate courts to do their job, further ensuring meaningful appellate review *of the evidence* presented in recommitment proceedings." ***D.J.W.***, 391 Wis. 2d 231, ¶¶42-44 (emphases added); *see also* ***Sheboygan County v. M.W.***, 2022 WI 40, ¶25, 402 Wis. 2d 1, 974 N.W.2d 733 ("[T]he ***D.J.W.*** directive was intended to 'clarify issues raised on appeal of recommitment orders and ensure the soundness of judicial decision making, *specifically with regard to challenges based on the sufficiency of the evidence*." (Emphasis added.)). But, in Miller's case, none of these reasons apply—Miller acknowledges, and there is no dispute, that § 51.20(1)(a)2.c., the third standard, provides the "underlying basis for" her recommitment; Miller does not challenge the sufficiency of the evidence supporting her recommitment under § 51.20(1)(a)2.c. and (am); the record in fact contains sufficient evidence; and the record is adequate for us to be able to "do [our] job" of providing "meaningful appellate review of the evidence presented [at the] recommitment proceeding[]." *See* ***D.J.W.***, 391 Wis. 2d 231, ¶44. ***D.J.W.*** did not suggest that a recommitment order must be reversed where, as here, the

statutory basis for the order is clear and the evidence is sufficient to support that statutory basis.

¶32   Absent such a directive, we note, as pointed out by the County, that even if the circuit court had failed to make adequate findings of fact, we may affirm the decision if the evidence clearly supports it, reverse the decision if it is not so supported, or remand for further findings and conclusions. *See Kraemer v. Kraemer*, 67 Wis. 2d 319, 320, 227 N.W.2d 61 (1975); *see also State v. Margaret H.*, 2000 WI 42, ¶37, 234 Wis. 2d 606, 610 N.W.2d 475.   In this case, the extension order expired before the completion of briefing; "as a consequence[,] the circuit court lacks competency to conduct any proceedings on remand."  *See M.W.*, 402 Wis. 2d 1, ¶38.  So, remand is not an option.  And again, Miller does not suggest that the evidence does not support the court's decision, and we do not see *D.J.W.* as mandating reversal where the evidence clearly supports the decision.

¶33   Additionally, as argued by the County, the harmless error rule of WIS. STAT. § 51.20(10)(c) also supports our decision to affirm the circuit court.  Section 51.20(10)(c) states:  "The court shall hold a final hearing to determine if the allegations specified in sub. (1) are true…. The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings that does not affect the substantial rights of either party."  "For an error 'to affect the substantial rights' of a party, there must be a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue." *Martindale v. Ripp*, 2001 WI 113, ¶32, 246 Wis. 2d 67, 629 N.W.2d 698.   A reasonable possibility is a possibility that undermines confidence in the outcome.  *Id.*

¶34     Where, as here, the evidence presented at the hearing was sufficient to sustain the circuit court's determination of dangerousness under the third standard, as, again, Miller does not dispute, we conclude that any shortcoming in the court's comments related to dangerousness is harmless.  We so conclude because even if the court erred by failing to state sufficient findings, this failure did not contribute to the outcome of the final hearing—granting a recommitment order—and does not undermine our confidence in that outcome.  If the alleged error had not occurred, the court simply would have made more comments drawing from the presented evidence to support its dangerousness determination. The court's determination and the resulting order would remain the same.

*By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.