COURT OF APPEALS
DECISION
DATED AND FILED

**January 8, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP1972**

**STATE OF WISCONSIN**

Cir. Ct. No. 2023ME75

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE MENTAL COMMITMENT OF T.R.B.:

COLUMBIA COUNTY,

    PETITIONER-RESPONDENT,

  V.

T.R.B.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Columbia County: ROGER L. KLOPP, Judge. *Affirmed*.

¶1    TAYLOR, J.[1]   T.R.B. appeals from orders extending his commitment under WIS. STAT. ch. 51 and authorizing his involuntary medication. T.R.B. argues that at the hearing to extend his commitment, the sole evidence that he had behaved dangerously was inadmissible hearsay.  He further argues that with this evidence properly excluded, Columbia County ("the County") did not present sufficient evidence of his dangerousness to sustain an extension of his involuntary commitment.  I conclude that there was sufficient nonhearsay evidence in the record to support a conclusion that T.R.B. is "dangerous" pursuant to WIS. STAT. §§ 51.20(1)(a)2.b. and 51.20(1)(am).  Accordingly, I affirm the orders of the circuit court.

## BACKGROUND

¶2    On December 11, 2023, T.R.B.'s mother, father, and aunt filed a three-party petition for the involuntary commitment of T.R.B. under WIS. STAT. § 51.20(1)(a)2.  The petition alleged, in pertinent part, that: in the prior ten days, T.R.B. made 30 calls to police or EMS; T.R.B. alleged that family members who had recently died of natural causes had been murdered; that his parents are being controlled by someone; that someone is directing a magnet or a magnetic force at his house, causing it to shake; that people are out to kill him; and that T.R.B. was turning off the electricity to the house he shared with his parents, jeopardizing his father's insulin medication.  The circuit court issued an order for detention and T.R.B. was placed in protective custody and taken to Winnebago Mental Health Institute ("WMHI"), with a probable cause hearing scheduled for December 2023.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

¶3 Prior to the probable cause hearing, the parties entered into a Settlement Agreement ("the Agreement"). The Agreement provided that in exchange for T.R.B. complying with certain conditions, including taking all prescribed medications and being transferred to Granite Hills Hospital, the commitment proceedings would be dismissed in March 2024.

¶4 On January 8, 2024, the State filed with the circuit court a Statement of Noncompliance, which alleged that T.R.B. had failed to comply with the requirements of the Agreement to "[k]eep all appointments with treatment providers and case management staff" and "[r]efrain from acts, attempts, or threats of harm to self or others." In support, the State alleged as follows. T.R.B. had been discharged from Granite Hills Hospital on December 24, 2023, at which time staff expressed concerns about T.R.B.'s refusal to take medications. T.R.B. failed to meet with his assigned case worker on two occasions, and during one phone contact, T.R.B. denied being subject to the Agreement or the need for treatment. In January 2024, T.R.B. was arrested and charged with felony bail jumping, domestic disorderly conduct, and domestic battery. The police report indicated that T.R.B. had a physical altercation with his father and made threats to kill his parents. The circuit court issued an order that T.R.B. be detained at WMHI pending the final hearing in the commitment proceedings.

¶5 Pending the final hearing, Dr. Andrew Kordus, T.R.B.'s treating psychiatrist at WMHI, moved the circuit court for an order for the involuntary administration of psychotropic medication. At the January 11, 2024 hearing on this request, Dr. Kordus testified as follows. He diagnosed T.R.B. with an "unspecified schizophrenia spectrum or other psychosis with a likely diagnosis of schizophrenia." After meeting with T.R.B. several times and discussing the advantages, disadvantages, and alternatives to accepting psychotropic medication,

Dr. Kordus concluded to a reasonable degree of medical certainty that T.R.B. could not understand and apply the provided information to make an informed decision as to whether or not to accept or refuse medication. A medication was available to treat T.R.B.'s condition, which would not impair T.R.B.'s ability to prepare for or participate in any future court proceedings. Out of five doses of the medication offered, T.R.B. accepted two doses and refused three doses. Inconsistent use of the medication will not establish a therapeutic level necessary to treat T.R.B.'s condition. T.R.B. does not believe that he has a mental illness and does not wish to take medication.

¶6 The circuit court found probable cause that due to mental illness, T.R.B. was not competent to refuse medication and ordered the involuntary administration of psychotropic medication until the final hearing in the commitment proceedings.

¶7 The final hearing on the petition occurred on January 18, 2024. The State presented three witnesses in support of the petition: Dr. James Black, a court appointed psychologist; Dr. Marshall Bales, a court appointed psychiatrist; and T.R.B.'s mother.

¶8 Dr. Black testified, in pertinent part, as follows. He spent about one hour interviewing T.R.B. at WMHI and consulted with staff, in addition to reviewing records from WMHI, Columbia County, Columbia County Jail, and the Columbia County Sheriff's Department, and prepared an examination report. T.R.B. has a diagnosis of schizophrenia spectrum disorder; he has a history of verbal and physical aggression, some of which continued at WMHI; he has made threats to harm his family and got into a physical altercation with his mother and father; T.R.B. has little insight into his mental illness and would likely not seek

4

treatment without a court order; and he is substantially dangerous to himself and others. Dr. Black opined that the least restrictive placement for T.R.B. would be in a locked facility until he begins to stabilize from consistent administration of medication. At that point, T.R.B. can be transitioned into outpatient care.

¶9 Dr. Bales testified as follows. He met with T.R.B. for about thirty minutes, reviewed records from WMHI and Granite Hills, the three-party petition, and police reports, and completed an examination report. During the meeting, T.R.B. was "extremely paranoid, irritable, accusatory, confused and disorganized in his thinking and hostile." Dr. Bales diagnosed T.R.B. with paranoid schizophrenia and concluded that T.R.B. is dangerous to other people, that he has had months of delusional and paranoid behavior, particularly about his parents, and spoke in hostile terms about them, and that he has put his family in fear for their safety. Although T.R.B. is definitely treatable with an antipsychotic medication, he "simply will not get mental health care voluntarily on his own free will." When Dr. Bales discussed the advantages, disadvantages, and alternatives to accepting psychotropic medication, T.R.B. "was not reasonable, not rational[,] and could neither express nor properly apply information to himself. He thought the medicine was part of a conspiracy by his family and others." Dr. Bales recommended that T.R.B. be involuntary detained in a locked facility.

¶10 Both examiners' reports were admitted into evidence with no objections.

¶11 T.R.B.'s mother also testified about recent incidents with T.R.B., her fear of him, and her concerns that he would hurt himself or others. I discuss further details of her testimony below.

5

¶12     The circuit court found that T.R.B. was mentally ill and evidences a substantial probability of physical harm to other individuals pursuant to WIS. STAT. § 51.20(1)(a)2.b.  Accordingly, the court ordered that T.R.B. be involuntary committed for six months in a locked facility and be involuntarily administered medication and treatment.

¶13     T.R.B. was released from WMHI to his parents' house in February 2024, and began participating in and receiving supportive services through the County's Community Support Program ("the CSP").  In June 2024, the County petitioned the circuit court for an extension of the commitment and involuntary medication orders, "to assist [T.R.B.] in taking his medication(s) as prescribed and to comply with treatment recommendations."  Dr. Leslie Taylor, a psychiatrist, was appointed by the court to conduct an examination of T.R.B., and the extension hearing took place on July 11, 2024.  Initially, an extension was contested, and the circuit court took testimony from Dr. Taylor, who recommended an extension. The parties eventually stipulated to a six-month extension of the commitment order, with the same conditions as previously ordered, and an involuntary medication order.

¶14     T.R.B. continued to participate in the CSP and to live with his parents, who monitored his medication compliance.  From approximately August through November, 2024, T.R.B. was incarcerated due to numerous pending criminal cases and concerns about his competency.  When the commitment expiration date approached, the County sought to extend T.R.B.'s commitment. As a basis for the request, the County attached to the petition a letter titled "Recommendation for Recommitment" signed by Sarah Niles, the CSP director who enrolled T.R.B. in the CSP (the "petition letter").  The petition letter stated that due to T.R.B. being in the community for three months only out of the last six

6

months, CSP would like more time for T.R.B. "to increase his mental health insight [so that] he can demonstrate consistent daily behaviors of self-administering his daily medications and remaining safely in the community with no harm to self or others." Because of "the probability that [T.R.B.] would cease receiving any medications and run the risk of further decompensation and re-hospitalization if not under commitment," CSP recommended a commitment extension of six months.

¶15 On January 14, 2025, the circuit court held a contested hearing regarding the petition for extension of the commitment and involuntary medication orders. The County presented three witnesses: the court appointed examiner, psychiatrist Dr. Leslie Taylor, who had also evaluated T.R.B. for the July 2024 extension hearing; T.R.B.'s CSP case manager Devon Webster; and CSP director Niles.

¶16 Dr. Taylor testified as follows. In addition to meeting with T.R.B. personally in his house for approximately 30 minutes, she spoke with Niles, T.R.B.'s mother, and reviewed prior evaluations and treatment records and prepared an examination report. T.R.B. has been diagnosed with schizophrenia, which T.R.B. does not believe he has. Instead, T.R.B. believes that people, particular his father, are lying about him. T.R.B. stated that the psychotropic medication he takes helps with his anxiety and stress, but "[h]e was very clear, however, that he doesn't have schizophrenia; that he doesn't have delusional thinking and that the medication is not helping the delusional thinking or treating the schizophrenia. He said that anyone who diagnosed him with schizophrenia was, basically, lying." T.R.B. is incapable of applying an understanding of the advantages, disadvantages, or alternatives to treatment of his condition in order to

make an informed choice about the medication being recommended, and he is not competent to refuse medication.

¶17 Dr. Taylor further opined as follows. T.R.B. "does pose a substantial risk of dangerousness to himself or others if treatment were withdrawn" because he "continues to lack insight into the severity of his behaviors, the behaviors that led him to be emergently detained. He continues to believe that his father has been lying about him. He denies that the … version of events that actually happened." T.R.B. is not competent to refuse medication, so an order to treat would be warranted. If treatment for schizophrenia were withdrawn, "his delusional thinking will, once again, worsen to the level that it was prior to his being placed on an emergency detention," and he would once again become a proper subject for involuntary commitment.

¶18 On the County's request to move Dr. Taylor's examination report into evidence, T.R.B. objected on the ground that it was "riddled with hearsay." Although T.R.B. acknowledged that the hearsay statements could be used by Dr. Taylor to form an opinion, the hearsay statements could not be relied upon for the truth of the facts asserted. The circuit court overruled the objection and accepted the examination report into evidence.

¶19 Devon Webster testified as follows. Webster is a social worker and has been T.R.B.'s case manager in the CSP since May 2024. Webster meets regularly with T.R.B. at T.R.B.'s house and facilitates supportive services, including psychotherapy. T.R.B. needs to be recommitted because he "demonstrates a lack of insight into his mental health. He does not believe he has schizophrenia of any sort." T.R.B. has been noncompliant at times with taking his medication. Most recently, T.R.B. had an extra six days of medication remaining

at the end of a five-week medication period. Without an extension, there are concerns about medication compliance and "rapid decompensation."

¶20 Sarah Niles testified as follows. She is the CSP director and case manager, who enrolled T.R.B. in the program in May 2024 because in 2023 and 2024, "he was inconsistent with his medication compliance and he was hospitalized." Niles has periodic contact with T.R.B. because he is a patient in the program. Specifically, Niles had two recommitment discussions with T.R.B. in the summer of 2024 and in December 2024. In the summer of 2024, T.R.B. had fixed beliefs that he was "fixing" the electrical panel in the family home, which resulted in the electricity being shut off for several days and jeopardizing medications for other people in the home. During the December 2024 discussion, T.R.B. stated that "he was feeling a little bit better, that the medications helped him deal with people – with the stress of people, and his anxiety." He did not believe that he had paranoid schizophrenia, as diagnosed by the CSP's psychiatrist, who has been treating him since May 2024. T.R.B.'s hallucinations of being "shredded" and his "fixed beliefs of being controlled by steel magnets that are controlling and that can control the parents, specifically, the father" were a little less intense because "the fans were turned down." T.R.B. lacks "insight into his mental health and his medications of how it's affecting his symptoms." Niles recommended that T.R.B.'s commitment be extended "due to the lack of insight of the mental illness and the medication incompliance at times," which in the past lead to T.R.B.'s hospitalization.

¶21 When the County moved to introduce the petition letter into evidence, T.R.B. objected because it contained hearsay that "cannot be taken for the truth of the matter that's asserted within this document." The circuit court overruled the objection and received the document into evidence, stating that Niles

9

compiled the information in the letter in the course of her position as the director of the CSP and that the document is a medical record.

¶22 At the conclusion of the hearing, the circuit court referenced the following testimony and made the following factual findings. T.R.B. continues to exhibit severe delusional thinking and still felt that the "magnets were shredding him." In relation to his medications, that because of his delusional thinking, he would not be able to appreciate the advantages or disadvantages of taking those medications. Without an order to treat, T.R.B. may not take his medications regularly and in the appropriate doses. The court made specific references to Dr. Taylor's report that, prior to T.R.B.'s initial commitment: T.R.B. called the police 30 times in ten days for things such as magnets being focused on the family house, believing electrical equipment was dangerous, and his father needing to be killed because he was under the influence of spirits; and in January 2024,[2] the police were called to the family home because T.R.B. got into a physical altercation with his elderly father and threatened to kill his parents. Without an extension of the commitment and an order to treat, T.R.B. would likely decompensate and become a danger to others and himself. The court's written order for a one year recommitment states that T.R.B. is dangerous because he poses "a substantial probability of physical harm to other individuals" pursuant to WIS. STAT. §§ 51.20(1)(a)2.b. and 51.20(1)(am). The court also ordered involuntary medication and treatment during the period of commitment.

¶23 T.R.B. appeals.

---

[2] The circuit court states that the police were called to T.R.B.'s family home due to a January 2025 altercation between T.R.B. and his father. However, the record reveals that this incident occurred in January 2024, which is the date I reference when referring to this incident.

**DISCUSSION**

¶24      T.R.B. alleges that the County failed to prove by clear and convincing evidence that he was dangerous to himself or others because the circuit court: (1) erroneously exercised its discretion in admitting Dr. Taylor's examination report and Niles's petition letter, each which contained inadmissible hearsay; and (2) erred when it relied on hearsay evidence for its factual findings supporting its determination that T.R.B. was dangerous.  As a result, T.R.B. argues that the evidence of dangerousness for his January 2025 recommitment was insufficient.  Specifically, T.R.B. asserts that because neither Dr. Taylor, Webster, nor Niles had any personal knowledge about the incidents that lead to T.R.B.'s initial commitment, "[n]o other admissible evidence was presented to establish [T.R.B.'s] alleged actions or threatening statements that formed the basis of his original commitment."  Therefore, T.R.B. argues, the County failed to establish by clear and convincing evidence that T.R.B. is dangerous pursuant to WIS. STAT. §§ 51.20(1)(a)2.b. and 51.20(1)(am).

¶25      I reject T.R.B.'s argument that the circuit court erroneously exercised its discretion in admitting Dr. Taylor's examination report and Niles's petition letter because these documents contained relevant, nonhearsay evidence.  Further, because there is admissible evidence in the record that supports the court's factual findings and sufficiently establishes that T.R.B. was dangerous pursuant to WIS. STAT. §§ 51.20(1)(a)2.b. and 51.20(1)(am), I affirm.

**I.  General Principles and Standards of Review**

¶26      This case requires me to determine whether: (1) the circuit court erroneously exercised its discretion in admitting certain documents into evidence that contained hearsay statements; (2) the circuit court erred in making factual

findings; and (3) sufficient evidence was presented to conclude that T.R.B. was dangerous pursuant to WIS. STAT. §§ 51.20(1)(a)2.b. and 51.20(1)(am) as required for the January 2025 commitment extension.

¶27 This case involves review of the circuit court's decision to admit evidence over hearsay objections, which I review for an erroneous exercise of discretion. *Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698. The circuit court has broad discretion in admitting evidence at trial, and my inquiry on this issue is highly deferential. *Id.*, ¶29. I will uphold a decision to admit or exclude evidence "if the circuit court examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion." *Id.*, ¶28 (citation omitted). When reviewing a circuit court's exercise of discretion, I may search the record for reasons to sustain an exercise of discretion. *State v. Sulla*, 2016 WI 46, ¶23, 369 Wis. 2d 225, 880 N.W.2d 659.

¶28 This case also requires me to determine whether there was sufficient evidence to determine that T.R.B. was dangerous pursuant to WIS. STAT. §§ 51.20(1)(a)(2)b. and 51.20(1)(am). An involuntary commitment under WIS. STAT. ch. 51 requires the petitioner to prove by clear and convincing evidence that the subject individual is: (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous. *Langlade County v. D.J.W.*, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277.

¶29 In an initial involuntary commitment, a petitioner may prove that a person is "dangerous" in five different ways pursuant to WIS. STAT. § 51.20(1)(a)2.a.-e. *D.J.W.*, 391 Wis. 2d 231, ¶30. Pertinent here, one of the five ways is when a subject individual:

> (2) Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

§ 51.20(1)(a)2.b.

¶30 Upon petition, a circuit court may extend an initial six-month commitment for up to a period of one year. *See* WIS. STAT. § 51.20(13)(g)1. In a recommitment proceeding, because an individual's behavior might change due to receiving treatment, the county may meet its burden in proving that the individual is "dangerous" by an alternate path, without showing recent dangerous acts or omissions:

> [I]f the individual has been the subject of outpatient treatment for mental illness … immediately prior to commencement of the proceedings as a result of a commitment ordered by a court under this section, … the requirements of a recent overt act, attempt or threat to act under [§ 51.20(1)](a)2.a. or b., … may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.

§ 51.20(1)(am). This alternate path for proving dangerousness in a recommitment hearing "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur." *Portage County v. J.W.K.*, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509.

¶31 Although the alternate pathway set forth in WIS. STAT. § 51.20(1)(am) "acknowledges that an individual may still be dangerous despite

the absence of recent acts, omissions, or behaviors exhibiting dangerousness outlined in § 51.20(1)(a)[2.a.-e.]," the petitioner must still prove that an individual is currently dangerous by clear and convincing evidence. *J.W.K.*, 386 Wis. 2d 672, ¶¶24- 25. Moreover, circuit courts must "make specific factual findings with reference to the subdivision paragraph of § 51.20(1)(a)2. on which the recommitment is based." *D.J.W.*, 391 Wis. 2d 231, ¶40. This requirement serves a twofold purpose: given the significant deprivation of liberty inherent in a civil commitment, "it provides clarity and extra protection to patients regarding the underlying basis for a recommitment" and "will clarify issues raised on appeal of recommitment orders and ensure the soundness of judicial decision making, specifically with regard to challenges based on the sufficiency of the evidence." *Id.*, ¶¶42-44.

¶32 Whether the County has met its burden in a recommitment hearing is a mixed question of law and fact. *Id.*, ¶24. I will uphold a circuit court's findings of fact, and all reasonable inferences from those facts, unless they are clearly erroneous. *Id.* A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence. *Id.* I independently decide whether the facts satisfy the legal standard of whether T.R.B. was dangerous. *Id.*, ¶25.

**II. The Circuit Court Did Not Erroneously Exercise Its Discretion in Admitting Documents**

¶33 T.R.B. alleges that the circuit court erroneously exercised its discretion in admitting two documents into evidence: Dr. Taylor's examination report and Niles's petition letter. For the following reasons, I am not persuaded.

¶34 In regards to Dr. Taylor's examination report, Dr. Taylor was ordered by the circuit court "to examine [T.R.B.] to determine his current mental condition and deliver a report of such mental examination" to the court and the parties. In a recommitment hearing, a court may rely on admissible evidence contained in an examination report if the report is moved, and accepted, into evidence. *See **Outagamie County v. L.X.D.-O.**,* 2023 WI App 17, ¶36, 407 Wis. 2d 441, 991 N.W.2d 518 (in a recommitment hearing, an examiner's report must be received into evidence to be considered by the circuit court pursuant to WIS. STAT. § 51.20(10)(c)). Here, the County appropriately moved the examination report into evidence. As provided by WIS. STAT. § 907.03, if the facts or data in a particular case is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Dr. Taylor testified that in preparation for her examination report, she met with T.R.B. personally at his house for approximately 30 minutes, and she consulted collateral sources for her report, including speaking with T.R.B.'s mother and Niles, and reviewing prior evaluations and treatment records. There is no argument propounded by T.R.B. that these sources are not typically consulted by an expert performing a mental health examination nor that these sources were improperly referenced in the examination report to provide a basis for Dr. Taylor's opinion that T.R.B.'s commitment and order for medication be extended.

¶35 Although T.R.B. is correct that the circuit court provided no reasoning for the admission of the examination report, and treated the petition letter as a business or medical record, in my review of the record, I determine that the court did not erroneously exercise its discretion in admitting these documents. Both documents were highly relevant and necessary for the court's determination

of whether T.R.B.'s commitment and medication orders should be extended. Although each document contained hearsay statements, both documents also contained statements that T.R.B. provided directly to the interviewer, which are excluded from the definition of hearsay as party admissions pursuant to WIS. STAT. § 908.01(4)(b). Further, both documents provide admissible evidentiary support for each writer's recommendation that T.R.B. be recommitted, including each writer's personal observations of and conversations with T.R.B. Therefore, I conclude that the record demonstrates that the court did not erroneously exercise its discretion in admitting these documents.

### III. The Circuit Court's Factual Findings Are Not Clearly Erroneous and There Was Sufficient Evidence of Dangerousness

¶36 T.R.B. argues that the circuit court erred when it made factual findings based on inadmissible hearsay evidence. Specifically, T.R.B. objects to the court citing passages from Dr. Taylor's report that T.R.B. had made:

> … 30 calls to 911 in 10 days for various concerns, such as a magnet being focused on the house causing it to shake, believing electrical equipment was dangerous, and his father needed to be killed because he was under the influence of spirits. Further, the police were called to [the] home [i]n January … 202[4] as [T.R.B.] got into a physical altercation with his elderly father and threatened to kill his parents.

T.R.B. argues that there was "[n]o other admissible evidence … presented to establish [T.R.B.'s] alleged actions or threatening statements that formed the basis of his original commitment." I interpret T.R.B.'s argument to include that, based on these inadmissible hearsay statements, the court erred in its factual findings, in its determination of dangerous, and that if treatment were withheld from T.R.B., he would likely decompensate and pose a substantial risk of danger to others.

¶37 To be sure, there was admissible evidence which could have been referenced to provide a more compelling and robust set of factual findings to further support a determination of dangerousness. However, I am not persuaded that the circuit court's factual findings were in error nor that there was insufficient evidence to establish that T.R.B. was dangerous.

¶38 First, T.R.B. made admissions to both Dr. Taylor and Niles as detailed in their testimony and in the documents that were admitted to support a determination of dangerousness. In the "brief history" portion of Dr. Taylor's examination report, it states that there was a January 2024, altercation between T.R.B. and his father, for which criminal charges are pending and that T.R.B. has "a criminal court hearing coming up in January [2025]." The report also indicates that T.R.B. made specific statements to Dr. Taylor about an incident with his father and pending criminal charges: "He said his father 'beat him and I got arrested for abuse, they are coming at me hard for these things.'" The examination report notes that as a result of this incident, there were criminal charges brought against T.R.B., including for disorderly conduct and domestic battery. The report also indicates that T.R.B. stated that "he has another felony for calling the police too many times." It is reasonable to infer that Dr. Taylor's statements in her report about T.R.B.'s past dangerous conduct on which the circuit court relied are derived from T.R.B.'s own statements, the criminal charges that resulted, and

17

reasonable inferences that could be drawn from T.R.B.'s treatment history, all of which are admissible.[3]

¶39 Dr. Taylor's testimony about T.R.B.'s past dangerous conduct is also supported by T.R.B.'s mother's testimony in the initial confinement proceeding, which occurred one year prior to the recommitment hearing. As recognized by this court, "[d]angerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions (provided, of course, that there is a proper foundation for the latter.)" *Winnebago County v. S.H.,* 2020 WI App 46, ¶13, 393 Wis. 2d 511, 947 N.W.2d 761. At the initial commitment hearing in January 2024, T.R.B.'s mother testified as follows: that at the time of the original commitment petition in December 2023, T.R.B. was acting more irrational and making numerous calls to the sheriff about people wandering around outside the family home and about a propane gas facility letting off gases and running equipment that they did not have; T.R.B. had made threats to her and her husband; she is afraid of T.R.B. because another personality seems to take him over; she is afraid that T.R.B. might hurt himself or somebody else; T.R.B. had a physical altercation with her husband, she got caught in the middle, fell down and could not get up, and T.R.B. was arrested.

---

[3] This court may generally take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," which may include CCAP records. *See* WIS. STAT. § 902.01; *Kirk v. Credit Acceptance Corp*., 2013 WI App 32, ¶5 n.1, 346 Wis. 2d 635, 829 N.W.2d 522. I take judicial notice that at the time of T.R.B.'s January 2025 recommitment hearing, he had four separate criminal cases pending, including various disorderly conduct and battery counts as a domestic abuse repeater, some of which related to his telephone contact with law enforcement and the January 2024 incident at the family home.

¶40 The mother's testimony, including her cross-examination, provides an additional degree of reliability for Dr. Taylor's summary of past events in her report that T.R.B. had made threats to his parents, that T.R.B. engaged in a physical altercation with his father, who was almost 80 years old at the time, and for which, T.R.B. stated, he was facing criminal charges "for abuse." The mother's testimony also provides additional support for the circuit court's factual findings that T.R.B. repeatedly made calls to law enforcement, as T.R.B. also acknowledged to Dr. Taylor, because of his delusional behavior. Although the best practice may be for the petitioner to again solicit such testimony at a recommitment hearing, there was additional admissible evidence in the record which supports Dr. Taylor's statements cited by the court in its factual findings which sufficiently support the court's dangerousness determination.

¶41 It is true that T.R.B.'s mother never testified that T.R.B. had threatened to kill her and her husband, as specifically referenced in Dr. Taylor's report, nor about the specific number of calls T.R.B. had made to law enforcement and the subject of those calls. However, given the substance of the mother's testimony and T.R.B.'s statements to Dr. Taylor, I conclude that the circuit court's reference to the number of calls T.R.B. made to law enforcement and the detail about the specific threats to the parents was harmless error because there is not a "'reasonable possibility' that the error contributed to the outcome of the action or the proceeding at issue." *Martindale*, 246 Wis. 2d 67, ¶71 (citation omitted).

¶42 Niles's testimony also supports the circuit court's factual findings and its dangerousness determination. As noted, Niles testified that she had two recommitment discussions with T.R.B. in the summer of 2024 and in December 2024. In the summer of 2024, T.R.B. had fixed beliefs that he was repairing the electrical panel in the family home, which resulted in the electricity being shut off

19

for several days and jeopardizing medications for other family members. In the December 2024 discussion, T.R.B. stated that "he was feeling a little bit better, that the medications helped him deal with people – with the stress of people, and his anxiety," but that T.R.B. continued to believe that he was being "shredded" and "controlled by steel magnets that are controlling and that can control the parents, specifically, the father," but that these beliefs were less intense because "the fans were turned down."

¶43 This testimony not only supports the circuit court's factual finding that T.R.B. continued to have delusional thinking, but underscores the consensus from all of the witnesses at the recommitment hearing that, because T.R.B. did not believe that he had schizophrenia, he was not capable of equating his medication compliance with the amelioration of his mental health symptoms. And without being monitored for medication compliance and taking the medication, each witness believed that T.R.B. would decompensate and again engage in behaviors that were dangerous to others, as detailed by admissible evidence.

¶44 Accordingly, in sum on these issues, I conclude that the circuit court did not err in its factual findings and that there was clear and convincing evidence to support its determination that T.R.B. posed a danger to others pursuant to WIS. STAT. §§ 51.20(1)(a)2.b. and 51.20(1)(am). As a result, it was reasonable for the court to determine that, given T.R.B.'s treatment history, without orders for a recommitment and for medication, there was a substantial likelihood that T.R.B. would be a proper subject for commitment if treatment were withdrawn.

**CONCLUSION**

¶45 Accordingly, I affirm the order extending T.R.B.'s commitment and the associated order permitting his involuntary medication.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.